**INTERNATIONAL FIDELITY INSURANCE COMPANY, Plaintiff,**

v.

**COUNTY OF ROCKLAND, SWCF Architects Engineers Planners, Maniktala Associated, P.C., and Fidelity and Guaranty Insurance Company, Defendants.**

**No. 97 CIV. 3711(LMS).**

United States District Court, S.D. New York.

May 18, 2000.

See, also, 51 F. Supp.2d 285.

Thomas J. Demski, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.A., New York City, for Plaintiff International Fidelity Insurance Co.

Gregory E. Ronan, Goddard, Ronan & Dineen, New York City, for Defendant County of Rockland.

Cecil Holland, Jr., Hart & Hume, New York City, for Defendant Fidelity and Guaranty Insurance Company.

## MEMORANDUM DECISION AND ORDER

LISA MARGARET SMITH, United States Magistrate Judge.

Plaintiff International Fidelity Insurance Company ("IFIC") and defendant Fidelity and Guaranty Insurance Company ("F & G") have both submitted motions for summary judgment in this action, in which several of the parties involved in a construction project dispute who is liable for which portion of the damages resulting from a construction delay. Pursuant to the provisions of 28 U.S.C. § 636(c), the parties have consented to conduct all proceedings in this case before me.

Plaintiff IFIC is a surety company that took over the construction contract of its principal, a construction company, after that principal defaulted. Defendant County of Rockland (the "County") is the entity for whom the construction was being performed. As a result of the initial default and the ensuing delays, the County now asserts that IFIC is responsible for millions of dollars in delay damages. Plaintiff IFIC, on the other hand, says that it owes the County nothing because the County's claim is time-barred, and that the County owes IFIC over $100,000 in unpaid funds that were due to IFIC under the contracts between them.

IFIC's motion for summary judgment asks three things: (1) that the Court dismiss as time-barred the counterclaims for delay damages brought against it by the County; (2) that the Court award to IFIC the funds, constituting the remaining balance of the initial contract price, that IFIC says are due to it from the County under the contracts between those parties; and (3) that if the County's claims are not dismissed, the Court limit IFIC's liability to the County to the penal sum of the performance bond that IFIC executed as surety to the initial contractor (minus those unreimbursed sums that IFIC has already paid in completion of the project).

Defendant F & G is also a surety company, and it provided the performance bond for the contractor IFIC hired to complete the construction project after IFIC's original principal defaulted. Because F & G's principal also failed to complete its performance on time, IFIC brought "claims over" against F & G, demanding that F & G reimburse IFIC for any money IFIC may ultimately owe to the County because of the construction delays. In F & G's summary judgment motion, F & G reiterates two of IFIC's requests—that the County's counterclaims against IFIC

be dismissed, and that alternatively IFIC's liability be limited to the penal sum of its bond—and adds two others: (1) that the Court dismiss any "claims over" that IFIC may ultimately bring against F & G, because IFIC assertedly failed to comply with certain conditions precedent in the F & G bond; and (2) that if those claims over are not dismissed, the Court limit F & G's liability to IFIC to a sum that does not exceed the penal sum of F & G's bond, as well as to damages accrued only during a certain specified time period.

For the reasons discussed below, IFIC's motion for summary judgment is granted in part and denied in part, and F & G's motion for summary judgment is also granted in part and denied in part.

## STANDARD FOR SUMMARY JUDGMENT IN A CONTRACT ACTION

In accordance with Federal Rule of Civil Procedure 56(c), "[a] motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 320–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[A]ll ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988); *see also Celotex*, 477 U.S. at 330 n. 2, 106 S.Ct. 2548.

 In contract disputes, the Second Circuit has repeatedly held that

> summary judgment may be granted only where the language of the contract is unambiguous. *See, e.g., Sayers v. Rochester Tel. Corp.*, 7 F.3d 1091, 1094 (2d Cir.1993). Under New York law, wheth-

er a written contract is ambiguous is a question of law for the trial court whose determinations will be reviewed de novo. *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990). Contract terms are ambiguous if they are

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Sayers*, 7 F.3d at 1095 (internal quotation marks omitted). When the relevant language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion," no ambiguity exists. *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978).

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996).

 In *Sayers*, the Second Circuit added that, even where parties dispute the meaning of specific contract clauses, a court's task

> is to determine whether such clauses are ambiguous when "read in the context of the entire agreement." *W.W.W. Assocs.*, 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639; *see also Williams Press, Inc. v. State*, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (1975). By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous. *See Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984). . . . Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement.

*Sayers*, 7 F.3d at 1095 (some internal citations omitted); *see also General Authority for Supply Commodities, Cairo, Egypt v. Ins. Co. of North America*, 951 F.Supp. 1097, 1108 (S.D.N.Y.1997).

■ New York courts have held that "The interpretation of a contract of suretyship is governed by the standards which govern the interpretation of contracts in general." *General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 92, 89 N.E.2d 238 (1949). As far back as 1889, the Court of Appeals said that "No citation of authorities is needed to show that the contracts of sureties are to be construed like other contracts so as to give effect to the intention of the parties. In ascertaining that intention, we are to read the language used by the parties in light of the circumstances surrounding the execution of the instrument, and, when we have thus ascertained their meaning, we are to give it effect[.]" *People v. Backus*, 117 N.Y. 196, 201, 22 N.E. 759 (1889). The *Backus* court then added, "when the meaning of the language used has been thus ascertained, the responsibility of the surety is not to be extended or enlarged by implication or construction, and is strictissimi juris." *Id.*

When applying the *Backus* standard to a case governed by New York law that involves a compensated surety,

> [t]he rule that the liability of a surety is strictissimi juris does not in any sense mean that a suretyship contract is subject to rules of interpretation different from those applicable to any other contract. It simply means that once the intention of the parties to a suretyship agreement has been ascertained, the courts will guard the right of the surety, and protect him [, her, or it] against a liability which is not strictly within the terms of his [, her, or its] contract.

63 N.Y. Jur 2d, Guaranty & Suretyship § 117 (1987) (citing *id.* at § 88; *Argyle v. Plunkett*, 226 N.Y. 306 [, 310], 124 N.E. 1 (1919) ("a surety is not entitled to any particular tenderness in the interpretation of the language of a contract which it has

executed.... When, however, the contract has thus been interpreted the surety is entitled to a strict limitation of its obligations in accordance with such interpretation")). In fact, in cases in which New York courts have suggested that *any* deviation from the general rules of interpretation should apply when interpreting surety bonds, they have counseled, at least in the case of compensated sureties, interpretation against the surety. *See, e.g., McClare v. Massachusetts Bonding & Ins. Co.*, 266 N.Y. 371, 377, 195 N.E. 15 (1935) ("where a compensated surety has issued a standard form of bond, it is to be interpreted liberally, and all ambiguities are to be resolved in favor of those for whose benefit the bond is given"); *see also Novak & Co. v. Travelers Indem. Co.*, 85 Misc.2d 957, 381 N.Y.S.2d 646 (N.Y.Sup.Ct.1976), *aff'd*, 56 A.D.2d 418, 392 N.Y.S.2d 901 (2d Dep't 1977) (bond of compensated surety is to be construed liberally in the interest of promisee and beneficiary rather than strictissimi juris, and ambiguities are to be resolved in favor of beneficiary); *Dupack v. Nationwide Leisure Corp.*, 73 A.D.2d 903, 905, 424 N.Y.S.2d 436 (1st Dep't 1980).

The rule of strictissimi juris is not rigidly to be applied where a surety bond is executed for a consideration by a corporation organized for the purpose of doing business as a surety—that is, in the case of compensated sureties or surety companies—particularly with regard to evaluating the requirements an obligee must satisfy to invoke a surety's liability. 63 N.Y. Jur 2d, *id.* §§ 118, 522; *McKegney v. Illinois Surety Co.*, 170 A.D. 261, 155 N.Y.S. 1041 (1st Dep't 1915); *Hunt v. Bankers & Shippers Ins. Co.*, 60 A.D.2d 781, 400 N.Y.S.2d 645 (4th Dep't 1977), app. after remand on other grounds, 73 A.D.2d 797, 423 N.Y.S.2d 718 (4th Dep't 1979), *aff'd*, 50 N.Y.2d 938, 431 N.Y.S.2d 454, 409 N.E.2d 928 (1980). In *McKegney*, the Court noted that " 'The rule of strictissimi juris is a stringent one, and is liable at times to work a practical injustice. It is one which ought not to be extended to contracts not

within the reason of the rule, particularly when the bond is underwritten' " for profit by a corporation, *id.* at 264, 155 N.Y.S. 1041 (quoting *United States Fidelity & Guaranty Co. v. United States,* 191 U.S. 416, 24 S.Ct. 142, 48 L.Ed. 242 (1903)). Therefore, the *McKegney* court concluded, "the rule of strictissimi juris does not apply, at least so far as nonessentials are concerned," to compensated surety companies. *McKegney, id.* In such cases, where the liability of the surety may depend upon the *performance by the obligee* of some act or the fulfillment of a condition, including performance of a condition precedent, the rule may be relaxed and the surety's liability may be predicated upon *substantial performance by the obligee* of the act. 63 N.Y. Jur 2d, *id.,* §§ 118 & 522; *McKegney, id.* (demanding only substantial compliance by obligee with notice requirements in a bond); *Hunt,* 60 A.D.2d at 783, 400 N.Y.S.2d 645 (requiring only substantial performance by obligee owners of obligations under contracts upon which surety's liability was conditioned); *Bennett v. Brown,* 20 N.Y. 99 (1859) (rejecting surety's defense as being based on overly-literal construction of words of condition); *St. John's College v. Aetna Indem. Co.,* 201 N.Y. 335, 94 N.E. 994 (1911) (finding that a material alteration of a contract for whose performance a surety is bound must affect the surety adversely to result in release of surety from its obligation); *Newark v. James F. Leary Constr. Co.,* 118 Misc. 622, 194 N.Y.S. 212 (N.Y.Sup.Ct.1922) (surety company guaranteeing performance of contract is held to rule of substantial performance rather than strict construction of contract).

However, while requirements pertaining to the obligee's performance may be relaxed from the standards that would be required by strict construction of the conditions, New York courts do not apply such flexibility to enforcement of the nature and extent of the surety's obligation. As noted, once the contract has been interpreted "the surety is entitled to a strict limitation of its obligations in accordance with such interpretation." *Argyle,* 226 N.Y. at 310, 124 N.E. 1 (1919) (interpreting and enforcing bond of surety company, and deciding that where obligee required bond conditioned for the faithful performance of the contract and for the payment of all debts incurred for work and materials, but the surety's undertaking was simply conditioned for the faithful performance of the contract, surety was not liable for payment of debts). *See also Bank of Italy v. Merchants' Nat'l Bank,* 236 N.Y. 106, 140 N.E. 211 (1923) (refusing to apply surety's payment obligation for "dried grapes" to payment obligation for "raisins," because the two terms might be distinct under trade usage), *cert. denied,* 264 U.S. 581, 44 S.Ct. 331, 68 L.Ed. 860 (1924); *Border v. Frank G. Cook & Sons,* 240 A.D. 476, 478, 270 N.Y.S. 229 (4th Dep't 1934) (refusing to extend liability under the contract of suretyship "beyond the limitations fixed by the parties to the undertaking"—in that case, for work done only on a particular building); *Buffalo Slag Co. v. H & D Constr. Co.,* 94 Misc.2d 212, 404 N.Y.S.2d 292 (N.Y.Sup.1978) (limiting surety's obligation to face amount of bond where surety had not contemplated or consented to increase in amount of liability, or received additional compensation). While ordinarily the liability of a guarantor or surety is equal to the liability of the principal, "the guarantee is a separate undertaking and may impose lesser or even greater collateral responsibility on the guarantor." *American Trading Co., Inc. v. Fish,* 42 N.Y.2d 20, 26, 396 N.Y.S.2d 617, 364 N.E.2d 1309 (1977); 63 N.Y. Jur 2d, *id.,* § 553. In general, "the surety bonds attaches to the principal contract and must be construed with it," *Carrols Equities Corp. v. Villnave,* 57 A.D.2d 1044, 1045, 395 N.Y.S.2d 800 (4th Dep't 1977), *app. denied,* 42 N.Y.2d 810, 399 N.Y.S.2d 1026, 369 N.E.2d 775 (1977), and "the liability of a surety cannot be extended beyond the plain and explicit language of the [bond] contract," *Mendel–Mesick–Cohen–Architects v. Peerless Ins. Co.,* 74 A.D.2d 712, 712, 426

N.Y.S.2d 124 (3d Dep't 1980), or beyond the meaning as ascertained by construction, once that meaning has been ascertained. *Richardson v. Steuben County,* 226 N.Y. 13, 19–20, 122 N.E. 449 (1919); *see also* 63 *N.Y. Jur 2d, id.,* § 121 and n. 65 (citing cases).

## BACKGROUND

The following facts are taken from the findings of undisputed fact made by this Court (McMahon, J.) in an earlier motion in this case, supplemented by the submissions of the parties for this motion. In those few cases where there is any dispute or uncertainty about a particular fact, that uncertainty is noted along with the source of the pertinent information.

It is undisputed that in February of 1994, Rockland County issued a construction contract (the "Contract" or the "Construction Contract") for the build-out of the ninth floor of the Dr. Robert L. Yeager Health Center (the "Yeager Center"). The Yeager Center is a County-owned nursing facility in Pomona, New York. The original construction contractor was a company called NANCO. Under the Contract, construction was to be substantially completed within 180 days, or by August 8, 1994.

Under the terms of the Contract, NANCO was required to post payment and performance bonds, naming the County as obligee, to secure the construction project. IFIC stood surety under those bonds, but IFIC was not a party to the underlying Contract. Pursuant to the performance bond, IFIC had the right, in the event of default by NANCO and termination by the County of NANCO's right to complete the Contract, to either (1) arrange for NANCO to complete the Contract (if the County approved); (2) obtain bids for completion of the Contract from qualified contractors acceptable to the County, and arrange for a contract to be prepared for execution between the County and the new contractor; (3) take over the contractor's obligations under the original Construction Contract and complete performance through agents or independent contractors; or (4) either waive its right to perform and complete, and tender the amount due to the County, or make a formal denial of liability to the County, citing the reasons therefor. *See* IFIC's Performance Bond ("IFIC Bond" or "Bond"), attached as Ex. A to Affidavit of Thomas J. Demski, dated September 17, 1999 ("Demski Aff."), at ¶ 4.

On August 4, 1994, after determining that NANCO would be unable to complete the project in a timely manner, the County declared NANCO in default. IFIC then exercised its option, under ¶ 4.2 of the Bond, to "Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors[.]" *See* IFIC Performance Bond at ¶ 4.2; Brief in Support of Plaintiff International Fidelity Insurance Company's Motion ("Plaintiff's Brief") at 13. Accordingly, on October 24, 1994, IFIC and the County executed a Takeover Agreement, pursuant to which IFIC agreed to complete the construction contract in exchange for receipt of payment, "in accordance with the payment terms of the contract," of the remaining proceeds due under the Construction Contract (the "Balance of the Contract Price"). Takeover Agreement at ¶ 4. The Takeover Agreement provided that all the terms of the underlying Construction Contract were incorporated into the Takeover Agreement by reference. The Takeover Agreement also provided that nothing in it affected any of the rights and obligations of IFIC or the other parties under the terms of the Construction Contract, or under the performance bond issued thereunder by IFIC. *See* Takeover Agreement, attached as Ex. C to Demski Aff., at ¶ 6 (entitled "Reaffirm Bonds"). It further provided that nothing in the Takeover Agreement would waive either party's rights with respect to the termination of the Contract by the County, and specifically added that IFIC and the County

were entering into the agreement "under a full reservation of all of their rights and defenses and those of the Principal [NANCO]." *Id.* at ¶ 7.

IFIC engaged a company called Hirani Contracting Corporation ("Hirani" or the "Completion Contractor") to complete the project, and entered into a completion contract (the "Completion Agreement") with it, under which Hirani agreed to complete all work on the Contract on or before 120 days from the date of the Takeover Agreement—that is, by February 21, 1995—or by any extended date approved by the Owner. *See* Completion Agreement, attached as Exhibit 3 to Affidavit and Exhibit in Support of Motion for Summary Judgment of Cecil Holland, Jr., dated September 16, 1999 ("Holland Aff."), at ¶ 4. Pursuant to the requirements of its Completion Agreement with IFIC, and as security for the performance of the Completion Agreement, Hirani obtained a performance bond from defendant F & G as surety, naming IFIC as obligee.

Hirani was unable to get the work done by the February date specified in the Completion Agreement. However, the County did not default IFIC when the deadline date passed; rather, according to later correspondence prepared by the County, it extended the completion date to September 12, 1995. Hirani continued to work, and the parties agree that the County continued to pay IFIC under the Construction Contract for some period after the initial February deadline date passed, although the assertions as to when the County stopped making those payments range from May to September of 1995. During that period—in June of 1995, according to F & G's Rule 56.1 statement—Hirani declared bankruptcy but continued to work on the build-out. The September extended completion date, like the initial February completion date, also passed without completion of the project. The project was finally accepted by the County's representative as substantially complete on October 5, 1995. Hirani then ceased work without completing the "punch list" of remaining items that it was contractually obligated to complete. IFIC made demands on Hirani and its surety, F & G, to complete the work, but the work was not completed, although the County was able to occupy the facility in December of 1995. On March 6, 1996, the County gave IFIC notice that it was terminated for its "failure to cure." The County subsequently permitted IFIC to finish the project with yet another contractor. The project was accepted by the County as complete on January 24, 1997.

On September 14, 1995, shortly before substantial completion and just after the passage of the extended completion date, the County served IFIC with a "Notice of Claim" for alleged delay damages, dating from the time of NANCO's initial default, totaling over four million dollars. The Notice of Claim stated that the County intended to submit the matter to its project architect, SWCF Architects Engineers Planners ("SWCF" or "Project Architect"), for resolution. IFIC notified the County that it opposed the proposed submission, asserting that such a claim was not properly submissible to the Project Architect, but rather should be resolved in a court of law. The County took no further action in regard to the claim until April 1, 1997, when, after final completion of the project, the County served IFIC with a more detailed analysis of the claim and forwarded the matter to SWCF for resolution. In response, on May 21, 1997, IFIC brought this proceeding, seeking, *inter alia,* not only (1) compensatory damages against the County for monies alleged to be due to IFIC under the Takeover Agreement, but also (2) a request for a declaratory judgment that the claims resolution procedure set forth in the original Construction Contract—allowing certain disputes to be submitted to the Project Architect for resolution—was inapplicable to this dispute, and that therefore the County could not submit its damage claim to the project architect. On June 23, 1997, the County filed its

answer, as well as its counterclaims against IFIC for delay damages.

IFIC, supported by defendant F & G,[1] then moved for summary judgment on its claim for a declaratory judgment preventing the County from submitting the delay damage dispute to the Project Architect. On May 24, 1999, this Court, in a decision by the Honorable Colleen McMahon, granted IFIC's motion, declaring that the Project Architect claims resolution procedure does not apply to this dispute, and permanently enjoining any proceeding before SWCF. In September of 1999, IFIC and F & G submitted the current summary judgment motions to the Court. On October 20, 1999, pursuant to the provisions of 28 U.S.C. § 636(c), the parties consented to conduct all proceedings in this case before me.

## DISCUSSION

### I. Time Limits on the County's Claims Against IFIC.

IFIC first asserts (with the concurrence of F & G) that the counterclaims for delay damages brought against IFIC by the County in this action are time-barred. It bases this assertion on the time-limitation provision in ¶ 9 of the Performance Bond, which states:

> Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction ... and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first.

IFIC Bond at ¶ 9. For the reasons set forth below, I conclude that the County's claim for delay damages resulting from NANCO's delay is an action under the Bond, and is barred by the time limit in ¶ 9 of the Bond, except to the extent that such damages are an offset against damages awarded for IFIC's claims against the County. I further conclude that the County's claim for delay damages resulting from IFIC's delayed performance is not a proceeding under the Bond, and is therefore not time-barred.

■ Under New York law, which the parties do not dispute applies to this action, parties to a contract are permitted to designate a limitations period shorter than the statutory period for filing actions based upon a contractual obligation. *See* N.Y. CPLR § 201. However, such an agreement must be in writing, and the shorter period selected must be reasonable. *Sapinkopf v. Cunard S.S. Co.*, 254 N.Y. 111, 172 N.E. 259, *cert. denied*, 282 U.S. 879, 51 S.Ct. 83, 75 L.Ed. 776 (1930). In addition, contracts of this sort are viewed with caution by the courts, and are construed strictly against the party invoking the shorter period. *Hauer Constr. Co. v. City of New York*, 193 Misc. 747, 85 N.Y.S.2d 42 (1948), *aff'd*, 276 A.D. 841, 93 N.Y.S.2d 915 (1st Dep't 1949). *See also Comey v. United Surety Co.*, 217 N.Y. 268, 277, 111 N.E. 832 (1916) (words of doubtful meaning, prescribing a limitation of action, in a surety's performance bond must be construed in favor of the obligee); *Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13, 20, 548 N.Y.S.2d 702 (2d Dep't 1989) (under New York law, contractual time limitations contained in a surety's performance bonds are to be strictly construed against the surety (citing *Comey*)). Therefore, if the limitations period in the Bond does apply to this action, any ambiguities in its language must be construed in the County's favor; and if the interpretation ascribed to the provision (particularly by the surety invoking the shorter peri-

---

1. IFIC, believing F & G to be a necessary party to this dispute under Federal Rule of Civil Procedure 19(a), first joined F & G as a defendant, and ultimately brought "claims over" against F & G demanding judgment against it, as surety to Hirani, for any liability to which IFIC might be subject in connection with Hirani's failure to perform satisfactorily under the Completion Contract.

od) is not reasonable, the limitation may not stand.

■ The essence of IFIC's time-limitation argument is that the word "Contractor" in this limitation clause refers only to NANCO; that NANCO's default (and cessation of work) occurred on August 4, 1994; and therefore that any action brought under the IFIC Bond—no matter which underlying contract was allegedly breached, which party allegedly breached it, or when that breach occurred—must be instituted within two years of the date of *NANCO*'s default (that is, by August 4, 1996), or it is time-barred. IFIC argues that because the counterclaims by the County in this action were not filed until June 23, 1997, those claims are time-barred in their entirety.[2]

The County, on the other hand, asserts two different grounds for its conclusion that its claim is not time-barred. First, it argues that when IFIC stepped into NANCO's shoes after NANCO'S default—by undertaking to perform and complete the Construction Contract itself, and by executing the Takeover Agreement to implement that course of action—IFIC became the "Contractor" for purposes of ¶ 9 of the Bond (the limitations provision). Thus, the County argues, to the extent that the limitations period in the Bond applies to this action at all, that limitations provision should be read to say that any proceeding, no matter which party's breach it may be based on, "shall be instituted within two years after [IFIC's] Default." Consequently, the County asserts, it had two years from the date of *IFIC's* default (which was certified by the Project Architect on February 28, 1996), or until February 28, 1998, to institute any action under the Bond, making its counterclaim timely.

The County's second argument is that it is not suing IFIC "under the Bond" at all, but rather is suing it for its breach of the Takeover Agreement and the underlying Construction Contract. Thus, the County asserts, the limitations provision in the Bond, which applies only to "[a]ny proceeding, legal or equitable, *under this Bond*" (emphasis added), does not apply at all; rather, the County argues that it is the six-year *statutory* limitations period applicable to contract-based actions that should apply, since neither the Takeover Agreement nor the Contract contains any provision for shortening the statutory limi-

---

**2.** This assertion must be modified in certain fundamental respects to conform to New York law, which states that "[a] defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, *it is not barred to the extent of the demand in the complaint* notwithstanding that it was barred at the time the claims asserted in the complaint were interposed." CPLR 203(d) (emphasis added). The complaint in this action was filed on May 21, 1997, making that date (rather than the June filing date of the counterclaims) the effective date for determining questions of timeliness. More importantly, the County's counterclaims arose from the same series of transactions or occurrences upon which the claims in IFIC's complaint depend. Therefore, under the last part of this rule, the defendant County "may interpose, as a recoupment, any claim arising out of the same transaction, even though an independent ac-

tion by the defendant on the claim would be time-barred." CPLR Practice Commentary C203:9, Counterclaims and Recoupments (McKinney 1990). Since this rule codifies the doctrine of equitable recoupment and was applicable even under the old New York Civil Practice Act (before the rule of "relation back" to the complaint date was instituted), *id.*, I find it reasonable to apply it to contractual as well as statutory limitations periods. The practical effect of its application is that, to the extent that all or any part of the county's damage claim may be otherwise time-barred, those time-barred damages (once proven) may still be applied as an offset against any damages proven against the County by IFIC. "Of course, no affirmative judgment can be entered in favor of the defendant [on any portion of its claim that is time-barred] since a recoupment, by definition, merely permits defendant to use his[, her, or its] claim as a defense." *Id.* (citing *Davis v. Davis*, 95 A.D.2d 674, 463 N.Y.S.2d 462 (1st Dep't 1983); *Chevron Oil Co. v. Atlas Oil Co.*, 28 A.D.2d 644, 280 N.Y.S.2d 731 (4th Dep't 1967)).

tations period. Actually, the Contract, which is incorporated by reference into the Takeover Agreement, does contain a provision for shortening the statutory limitations period.[3] However, the threshold question in regard to this issue is whether this action is brought "under the Bond," and thus which limitations provision should apply.

### A. Threshold Question: Do the County's Counterclaims Constitute a "proceeding under this Bond"?

The answer to this question hinges on a question of fact that is not clearly answered in any of the parties' submissions: namely, whether the County's claim for monetary damages against IFIC is a single unified claim, or if it is actually a composite claim for several different kinds of damages. The County demands compensation for lost profits, extra interest incurred, and lost depreciation reimbursement due to the delay in completion of the project, as well as prejudgment interest thereon. (*See* Complaint ¶¶ 65–72.) All of these damages are alleged by the County to be the result of the delay in their ability to move into the building and to begin servicing patients. However, a comparison of the damage allegations with the chronology of events listed above reveals that while some of the delay asserted by the County is presumptively attributable to NANCO's delayed performance and ultimate default, the later portion of the delay is more accurately attributable to Hirani's delayed performance, and therefore, derivately, to the delayed performance of IFIC. Such a distinction may have consequences for IFIC's liability under the specific language of this Bond. While IFIC is obligated, under the Bond, to pay for certain kinds of damages whether those damages were caused by NANCO or IFIC, IFIC's obligation is more limited in regard to other kinds of damages. In regard to the latter categories of damages,

IFIC's obligation under the Bond exists only if the damages were caused by NANCO, and not if they were caused by IFIC. Thus, a claim for these last categories of damages, to the extent that the damages were caused by IFIC, could not be brought under this Bond, although the claim might be brought under a separate obligation, such as the Takeover Agreement. A review of the language of the Bond, which is the American Institute of Architect's standard "AIA Document A312" Performance Bond dated December 1984, makes this distinction clear.

### B. IFIC's Obligations Under the Bond.

As noted above, there is no dispute between the parties that after NANCO's default, IFIC undertook to act under Subparagraph 4.2 of the Bond, which allows the Surety to "Undertake to perform and complete the construction Contract itself, through its agents or through independent contractors." The responsibilities and monetary obligations of a Surety whose principal has failed to perform its Construction Contract are delineated in ¶ 6 of the Bond, which states:

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

---

3. See Contract at ¶ 13.7, defining accrual dates for causes of action based on breaches of the Contract, and requiring that actions

(except those for latent defects) be brought no more than two years after the date on which the respective claim arose.

6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

Bond at ¶ 6.

The wording of Paragraph 6 of the Bond distinguishes between several different categories of potential damages in the subparagraphs. The Bond distinguishes between, on the one hand, those damages "resulting from" (¶ 6.2) or "caused by" (¶ 6.3) the actions or omissions of the *Contractor*, and, on the other hand, those resulting from the actions or omissions of the *Surety* (¶ 6.2). In addition, it addresses three different kinds of damages: those directly related to correcting and completing the Construction Contract (in ¶ 6.1); a variety of additional "costs" that might result from the Contractor's Default or from the Surety's actions or omissions under Paragraph 4 (in ¶ 6.2); and "liquidated damages, or . . . actual damages caused by delayed performance or non-performance" (in ¶ 6.3).

Finally, the Bond assigns liability differently for different categories of damages. In ¶ 6.2, the Bond obligates the Surety for the payment of "legal, design professional and delay costs" resulting both from the *Contractor's* Default and from "the actions or failure to act of the *Surety* under Paragraph 4." *Id.* (emphasis added). However, in ¶ 6.3, the Surety is obligated only for "Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages *caused by delayed performance or non-performance of the Contractor.*" *Id.* (emphasis added). That is the end of the sentence; the Bond

specifically *does not* obligate the Surety for payment of those liquidated or actual damages caused by *its own* delayed performance or non-performance under Paragraph 4, even though the sub-paragraph immediately before it specifically *does* obligate the Surety for payment of the specified "costs" when such costs are caused by its own actions or omissions.

The contrast between ¶ 6.2 and ¶ 6.3 cannot be ignored. *See Taracorp, Inc. v. NL Industries, Inc.,* 73 F.3d 738, 744–745 (7th Cir.1996) ("we assume that the same words have the same meaning . . . and that the choice of substantially different words to address analogous issues signifies a different approach. . . . This approach also accords with the basic contract principle that the meaning of separate contract provisions should be considered in light of one another and the context of the entire agreement") (citing *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (expressing the corresponding statutory presumption that Congress acts intentionally when particular language is included in one section of a statute but omitted in another)). The fact that this Bond is a standard American Institute of Architects ("AIA") document is relevant to its interpretation. As New York's Fourth Department noted in *Whitacre Construction Specialties, Inc. v. Aetna Casualty & Surety Co.,* 86 A.D.2d 972, 448 N.Y.S.2d 287 (4th Dep't), *aff'd,* 57 N.Y.2d 1018, 457 N.Y.S.2d 479, 443 N.E.2d 953 (1982), the AIA forms "were carefully drafted and the terms used were meant to have a consistent meaning throughout the documents." Sophisticated lawyers, such as those drafting standard forms to be used by the construction industry, must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning. They must also be presumed to be familiar with standard maxims of contract construction, including the maxim *ex-*

*pressio unium est exclusio alterius* (the expression of one thing is the exclusion of another). Thus, the drafters must have acted intentionally when they divided these damages into two different subparagraphs, used different words and sentence structures to describe them, and obligated the Surety to pay for the specified "additional ... costs" resulting from *both* the Contractors and the Surety's actions in ¶ 6.2, but obligated it to pay only for those liquidated or actual damages that were "caused by delayed performance or non-performance *of the Contractor*" in ¶ 6.3. By means of the clear distinction in treatment accorded to "liquidated ... or ... actual damages caused by delayed performance" in ¶ 6.3, the Bond on its face makes it explicitly clear that such damages constitute a separate category of damages; the Bond also distinguishes between the *existence* of the Surety's obligation under the Bond for "additional legal, design professional delay costs" resulting from *its own* actions or omissions under Paragraph 4, and the *absence* of any obligation to pay liquidated or actual damages caused by its own "delayed performance."

 The distinctions apparent in the Bond are supported by the case law and by treatises on construction and surety law. See, for example, 2 Steven G.M. Stein, *Construction Law* ("Stein"), Chapters 6 & 11 (Supp.Rel.32, 6/98), which provides an overview of damage categories in construction litigation. In a general discussion of damages available after termination of a contract, for example, Stein says:

The measure of the owner's damages following termination are the same whether the basis for termination is the contractor's delay or failure to prosecute the work or some other reason. Those damages are the excess completion costs, ... [which] are the cost of completing the work with a replacement contractor or the owner's own forces minus any unpaid balance under the terminated contract. Additionally the owner can recover any incidental damages actually sustained as a result of the terminating [sic], together with delay damages sustained prior to termination and for a reasonable period required for completion beyond the termination date.

*Id.,* ¶ 6.10[6] (citations omitted). Stein explains that the excess cost of completion of the contract—that is, the amount in excess of the contract price that it costs to complete the construction in accordance with the original contract plans and specifications—is the standard measure of *direct* damages[4] recoverable by the owner for the contractor's non-performance, partial performance (failure to complete) or defective performance. *Id.,* ¶¶ 11.02[2][a], 11.02[3][b], 11.01[3][d]; *see also* 36 *N.Y. Jur.2d* Damages § 49 (upon breach by the contractor, "[t]he cost of completion or correction ordinarily affords the proper measure of damages.... The owner may recover any cost in excess of the contract price to which he [or she] may be put in order to have the work finished" (citations omitted)); *Trainor Co. v. Aetna Casualty & Surety Co.,* 290 U.S. 47, 54, 54 S.Ct. 1, 78 L.Ed. 162 (1933) (citing, *inter alia, Kidd v. McCormick,* 83 N.Y. 391 (1881) for the proposition that "The measure of damage on a bond guaranteeing completion is the cost of completion," and adding, "it seems to us that the... decisions, ... cited above, are plainly right"). Such damages correspond to those under ¶ 6.1 of the Bond, "[t]he responsibilities of the Contractor for correction of defective work and completion of the Construction Contract," which are "subject to the commit-

---

4. Direct damages are those which naturally arise from the breach, and in regard to which only the amount has to be proven. *Id.,* ¶ 11.02[1]. Consequential damages, which would not necessarily arise in all similar circumstances but may have arisen in the case of the particular plaintiff, may also be awarded upon proof that they were reasonably foreseeable at the time of contracting and were within the contemplation of the parties at that time. *Id.,* ¶ 11.02[2][a]. Such damages will be discussed in more detail below.

ment by the Owner of the Balance of the Contract Price." Bond at ¶ 6.

Consequential damages, which would not necessarily arise in all similar circumstances but may have arisen in the case of the particular plaintiff, may also be awarded, although they are subject to the higher burden of proof that they were reasonably foreseeable at the time of contracting and were within the contemplation of the parties at that time. Stein, ¶ 11.02[2][a] (citing 11 Williston, *A Treatise on the Law of Contracts*, § 1636 (3d ed. 1961 & Supp.1989); Dan B. Dobbs, *Handbook on the Law of Remedies* ("Dobbs") § 12.3 (1973)); *McKegney v. Illinois Surety Co.*, 180 A.D. 507, 509, 167 N.Y.S. 843 (1st Dep't 1917) ("The plaintiff is entitled to that compensation which will leave him [or her] as well off as he [or she] would have been if the contract had been fully performed. This includes, not only the cost of completion, but also any special loss" by reason of defective performance, abandonment, delay, etc.); *Kidd*, 83 N.Y. 391; 36 N.Y. Jur.2d § 49. While the specific characterization of damages as consequential rather than direct may vary from one jurisdiction to another, Stein, ¶ 11.02[2][a] (citing cases), it is generally the case that certain additional "incidental" costs may be incurred by an owner due to a contractor's breach of the construction agreement. *See, e.g., Kinney v. Massachusetts Bonding & Ins. Co.*, 210 A.D. 285, 293, 206 N.Y.S. 163 (3d Dep't 1924) (allowing plaintiff to recover additional sums paid to architects to supervise the completing contractor, sums paid for legal services related to the contractor's default, and sums paid to procure a bond for the faithful performance of the completion contract); *Elmira v. Larry Walter, Inc.*, 150 A.D.2d 129, 546 N.Y.S.2d 183 (3d Dep't 1989) (allowing plaintiff to recover additional engineering and legal costs incurred to rebid the contract as result of contractor's breach), *aff'd*, 76

N.Y.2d 912, 563 N.Y.S.2d 45, 564 N.E.2d 655 (1990); *Kidd*, 83 N.Y. 391 (noting that "the cost of actual building may have increased after the day of performance, and so be a detrimental gauge of damage for the defaulting contractor"); 36 *N.Y. Jur.2d* § 49. These additional costs and expenditures, which the owner must pay to complete the construction of the building, clearly correspond to the category of damages addressed by ¶ 6.2 of the Bond, which obligates the Surety for "additional legal, design professional and delay costs resulting from the Contractor's Default". That subparagraph, as noted above, also obligates the Surety to pay for such costs "resulting from the actions or failure to act of the Surety under Paragraph 4".

However, "actual damages[5] caused by delayed performance" of the Contractor— the damages addressed in ¶ 6.3 of the Bond—constitute a different category of damages, and are calculated in a different manner. Essentially, they reflect not the additional incidental expenses required to complete the project, but rather the value of the "loss of use" of the structure, or loss of revenue, that the owner or the owner's business suffers as a result of delay in the completion of the structure.

> Inexcusable delay may arise in conjunction with the contractor's incomplete or defective performance, or a contractor may complete the performance of his [or her] contract without defect except for the failure to complete the work within the specified time period. Where the contractor inexcusably delays the completion of the construction project beyond the agreed upon completion date, the owner's *direct* damages, attributable to the delay, can be measured in one of two ways:
>
> 1. the rental value of the completed structure for the period of the delay; or

---

**5.** While ¶ 6.3 also addresses liquidated damages, such damages are not at issue in this case.

2. the reasonable return on the completed structure (treated as an investment) for the period of the delay.

*Construction Law,* ¶ 11.02[3][e][i], Owner's Damages for Inexcusable Delay by the Contractor—Direct Damages (emphasis added) (citing, *inter alia,* Dobbs, § 12.21 (1973)); *see also Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.,* 215 Va. 796, 802 n. 6, 214 S.E.2d 155 (1975).

In New York,

The measure of damages recoverable from a contractor who inexcusably delays in performance of his [or her] contract, or who breaches his [or her] contract with resulting delay in completion of the building to which his [or her] contract relates, is the value of the use of the building in completed form during the period the owner is thus deprived of it.... The damages in such cases are usually regarded as amounting to the reasonable rental value of the completed building for the period in question.

36 N.Y. Jur 2d, Damages, § 52—Delay in Performance (citing, *inter alia, Ruff v. Rinaldo,* 55 N.Y. 664 (1873)) (measure of damages for breach by contractor of stipulation as to the time of performance, where contractor has been allowed to go on and complete the contract, is the value of the use of the building for the period during which the owner is deprived of the use in consequence of the delay); *Losei Realty Corp. v. New York,* 254 N.Y. 41, 47–50, 171 N.E. 899 (1930) (landowner could recover, as damages resulting from city's delay in filling in property, loss in rental value resulting from the period of delay reasonably attributable to city).

In *Miami Heart Institute, Inc. v. Heery Architects and Engineers, Inc.,* 765 F.Supp. 1083 (S.D.Fla.1991), *aff'd,* 44 F.3d 1007 (11th Cir.1994), the Florida District Court elaborated upon "the measure for loss of use from delay" when computing the damages due to a hospital that was delayed in occupying its new building because of the acts and omissions of the contractor. *Id.* at 1084. The court explained,

When the owner loses the use of a structure because of delay in its completion, he [or she] is entitled [in addition to the out-of-pocket expenses incurred] to damages measured by the reasonable rental value of the structure during the period of delay. "During this period the owner is being deprived of the use of property, and rental value is used as a practical and a reasonably accurate measure of just compensation." 5 Corbin on Contracts § 1092. The rental value of the improvement during the period of delay, rather than the actual expense incurred in renting a substitute during the delay period, is the proper measure for delay damages [6]....

Rental value as the measure for loss of use "does not at all depend upon the fact that the owner expected to rent the property after its completion or upon the fact that prospective hirers or tenants could have been found." 5 Corbin on Contracts § 1092; Restatement of Contracts § 346(1)(b), comment c (Rental value is the ordinary measure for loss of use from delay "even though the use expected to be made ... was not the rent of it to others and even though some other use of it might have resulted in a different return.") "It is enough that the property is of such a character that its rental valuation, that is, the market value of its use, can be established

---

**6.** This particular rule is based on the opinion of a Florida appellate court. *See Russo v. Heil Constr., Inc.,* 549 So.2d 676, 677 (Fla. 5th DCA 1989). However, as noted in *Construction Law,* Chapter 11, *passim,* and discussed in more detail *infra,* such details of computation may vary from jurisdiction to jurisdiction. *See, e.g., Bevis Constr. Co. v.* *Kittrell,* 243 Miss. 549, 561, 139 So.2d 375 (1962) (awarding to plaintiffs, as loss of use damages, the value of "a reasonable rental, not to exceed the rent [actually] paid" by plaintiffs for rental of an alternate home while the completion of their contracted-for home was delayed).

with reasonable certainty by expert testimony." 5 Corbin on Contracts § 1092. *Miami Heart*, 765 F.Supp. at 1085 [7] (internal footnote added).

Included in this category of delay damages are the additional interest costs incurred by the owner due to delay, which may be recovered as direct or consequential damages, depending on the jurisdiction and the nature of the interest costs. For example, the additional interest costs attributable to the cost of extending the interim construction loan, at the same interest rate, over an additional number of months which resulted from delay, have been held to be direct damages, while the costs incurred due to interest rate increases applicable to the interim or permanent construction loan resulting from the delay may be considered consequential damages subject to proof of foreseeability. *See Roanoke Hosp.*, 215 Va. 796, 214 S.E.2d 155; *Hemenway Co. v. Bartex, Inc.*, 373 So.2d 1356 (La.Ct.App.), *cert. denied*, 376 So.2d 1272 (La.1979); *United Telecommunications, Inc. v. American Television & Communications Corp.*, 536 F.2d 1310

(10th Cir.1976); *Young v. Johnston*, 475 So.2d 1309 (Fla.Dist.Ct.App.1985); *Construction Law*, ¶¶ 11.02[2][a], 11.02[3][e], 11.02[6][c].

█ Subject to the proof requirements of consequential damages, claims for lost profits due to delay may also be recovered as delay damages, and in fact are "entirely permissible as an alternative to the rental value measure" of delay damages, Dobbs, § 12.21 (1973), particularly in the case of established businesses. Stein, ¶ 11.02[3][e] (citing cases); *see also Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 260, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (if a new business is seeking to recover for loss of future profits, a stricter standard is imposed because there does not exist a reasonable basis of experience upon which to estimate lost profits); *Louis N. Picciano & Son v. Olympic Constr. Co.*, 112 A.D.2d 604, 492 N.Y.S.2d 476 (3d Dep't 1985). Subject to the proof requirements of consequential damages, depreciation costs may also be recoverable. *Oliver B. Cannon & Son v. Dorr–Oliver, Inc.*, 394 A.2d 1160 (Del.1978).[8]

---

7. As noted above, courts may also supplant the "rental value" measure of delay damages with one measuring the reasonable return on the structure treated as an investment for the period of delay. *See Roanoke Hosp.*, 215 Va. at 802 n. 6, 214 S.E.2d 155 (citing 5A Corbin, Contracts § 1029 (177–78) (1964); Restatement of Contracts § 331(2) (1932)). This approach calculates the "amount of interest which the owner would receive during the period of the delay, at current rates, had he [or she] otherwise invested the amount of his [or her] expenditure for the building and the land." *Construction Law*, ¶ 11.02[3][e] (citing cases).

8. There are certain other kinds of recoverable consequential expenses that could accrue to an owner as a result of delay (or as a result of other kinds of breach) that might fit more neatly into the "cost of construction" category addressed by ¶ 6.2 of the Bond than into the "loss of use" or "loss of profit" category addressed by ¶ 6.3—that is, they represent what one court has referred to as the element of "out-of-pocket costs actually incurred as a result of the contract" rather than "the gain above costs that could have been realized had the contract been performed" (that is, the

"benefit of [the owner's] bargain"). *South Carolina Federal Savings Bank v. Thornton–Crosby Development Company, Inc.*, 303 S.C. 74, 77, 399 S.E.2d 8 (1990). These include, for example, additional overhead expenses for the contractor's home office or jobsite as a result of delay, increased cost of supervision and oversight of the construction, storage costs necessitated by breach or delay, or the increased cost of purchasing material or equipment incurred as a result of the delay. *See, e.g.,* Stein at ¶ 11.02[2][a] (citing cases). Following the maxim *noscitur a sociis* (the meaning of a term may be gathered from or qualified by accompanying words), it appears that these kinds of increased construction-related costs, when brought about by delay, would constitute "delay costs" of the kind addressed in ¶ 6.2 of the Bond along with the "additional legal and design professional costs" that could accrue from a breach. As such, they would fall within the parameters of the Surety's obligation under the Bond, whether they were caused by the actions or omissions of the Contractor or of the Surety. However, I need not parse out such expenses here, because the County's claims include only loss of revenue, additional interest in-

■ Because the County's counterclaims in this action are limited to claims for loss of revenue, lost depreciation reimbursement, and additional interest incurred due to the delay in completion of the building, the claimed damages all constitute "damages caused by delayed performance," Bond at ¶ 6.3, as such damages are understood in the construction industry and under construction law. Therefore, to the extent that they are "caused by delayed performance ... of the Contractor", such damages fall within the language of ¶ 6.3 of the Bond, and the Surety is obligated under the Bond for their payment. However, to the extent that such delay damages are caused by the actions of the *Surety,* they do not fall within the language, and therefore within the coverage, of the Bond.

There is no doubt that a surety may, through the language of its bond, strictly delineate the categories of damages for which it is responsible under the bond. *Bank of Italy v. Merchants' Nat'l Bank,* 236 N.Y. 106, 140 N.E. 211 (1923) (obligation for "dried grapes" does not apply to "raisins"), *cert. denied,* 264 U.S. 581, 44 S.Ct. 331, 68 L.Ed. 860 (1924); *American Trading Co., Inc. v. Fish,* 42 N.Y.2d 20, 26, 396 N.Y.S.2d 617, 364 N.E.2d 1309 (1977); *Richardson v. Steuben County,* 226 N.Y. 13, 19–20, 122 N.E. 449 (1919); *Argyle v. Plunkett,* 226 N.Y. 306, 310, 124 N.E. 1 (1919); *Border v. Frank G. Cook & Sons,* 240 A.D. 476, 270 N.Y.S. 229 (4th Dep't 1934). *See also United States v. American Surety Co.,* 322 U.S. 96, 64 S.Ct. 866, 88 L.Ed. 1158 (1944) (limiting surety's liability for liquidated damages to precise limitations specified in contract). Courts have recognized distinctions between a surety's liability for delay damages and the surety's liability for excess construction costs as an appropriate limitation on damages under a bond. Similarly, distinctions have been accepted between delay damage liability for the contractor's actions and those of the

surety. For example, in *American Home Assurance Co. v. Larkin General Hospital, Ltd.,* 593 So.2d 195 (1992), the Supreme Court of Florida determined that a surety cannot be held liable for delay damages due to the contractor's default, unless the bond specifically provides coverage for delay damages, *id.* at 196, which the bond in that case did not. The court added, "Our holding is limited to circumstances in which an owner sues a surety for delay damages due to a *contractor's* default. Whether an owner can recover consequential delay damages for a *surety's* failure to fulfill its obligations as set forth in a performance bond is not an issue before this Court." *Id.* at n. 2 (emphasis added). Compare *Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999), in which the Supreme Court of California disagreed with *Larkin* and decided, based on similar if not identical language, that under California law the bond and construction contract, construed together, did create contractual liability on the part of the surety for damages attributable to its principal's delay. *Id.* at 863, 980 P.2d 407. The court then added, "In light of our conclusion that [the surety] may be held liable for [the contractor's] delay, we need not decide whether the award of damages may be upheld on the alternative ground that [the surety's] breaches of the performance bond caused the damages at issue." *Id.* at 864, 980 P.2d 407.

Two Appellate Division cases from New York's Fourth Department address the question of a surety's liability for "loss of use" damages caused by its own actions or inactions. However, upon thorough review of those cases I conclude that they are not dispositive of New York law on this issue, as such law would be determined by the New York Court of Appeals. A federal court sitting in diversity must follow the law directed by the highest court of the

---

curred due to the delay, and lost depreciation reimbursement due to delayed use of the building, all of which constitute business loss-

es rather than incidental expenditures contributed to the building project. Complaint, ¶¶ 65–71.

state whose law is applicable to the resolution of the dispute. *Plummer v. Lederle Laboratories,* 819 F.2d 349, 355 (2d Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). When the highest state court has not ruled directly on the issue presented, a federal court must make its best estimate as to how the state's highest court would rule in the case. *Francis v. INA Life Ins. Co. of New York,* 809 F.2d 183, 185 (2d Cir.1987). In making that determination, the federal court is free to consider all the resources the highest court of the state could use. *Id.* " 'A federal court may discern the forum state's law by examining relevant decisions from a forum state's inferior courts, decisions from sister states, federal decisions and the general weight and trend of authority.' " *Allstate Ins. Co. v. American Transit Ins. Co.,* 977 F.Supp. 197, 200 (E.D.N.Y. 1997) (quoting *Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves,* 709 F.Supp. 44, 46 (D.Conn.1989)), *aff'd,* 929 F.2d 103 (2d Cir.1991). Because the Bond in this case is a standard form document intended to be used throughout the country, I presume that the New York Court of Appeals would be particularly likely to consider the general trend of authority outside New York state, as well as within it, in regard to issues of interpretation. Therefore, it is my "best estimate" that lower court decisions that do not reflect, analyze, or at least distinguish the line of authority outside New York would not necessarily reflect the position of the Court of Appeals. Nevertheless, I briefly review those New York lower court cases here.

In *Hunt v. Bankers and Shippers Ins. Co. of New York,* 73 A.D.2d 797, 423 N.Y.S.2d 718 (4th Dep't 1979) ("*Hunt I* "), a surety provided two performance bonds for its principal (on two construction projects), and also executed an agreement to complete the construction projects after the principal defaulted. The surety then apparently refused to fulfill the completion agreement. The *Hunt I* court stated—without addressing the language of the performance bonds or the completion

agreement—that "Had [the surety] performed its obligation, it would not have been liable for damages beyond its duty to complete or pay for the completion of the construction. Since it did not perform, however, [the surety] is liable for those damages which flow reasonably and naturally from the contractor's breach *as well as its own.*" *Id.* at 798, 423 N.Y.S.2d 718 (emphasis added). The court then held the surety liable for damages equal to the loss of value caused by the sale of the buildings in their uncompleted, as opposed to completed, condition.

Even if this language accurately stated New York law, it is questionable whether it would support an award of comparable damages to a surety that had, as IFIC did, performed by completing the project, albeit in a delayed fashion. However, the analysis and conclusions of the *Hunt I* court are not dispositive for several other reasons, not the least of which is that the Court of Appeals did not affirm the decision on its merits. Although the case was affirmed by the Court of Appeals, *Hunt v. Bankers and Shippers Ins. Co. of N.Y.,* 50 N.Y.2d 938, 431 N.Y.S.2d 454, 409 N.E.2d 928 (1980) ("*Hunt II* "), that affirmance was on procedural grounds. The Court of Appeals wrote:

We are constrained to affirm the order of the Appellate Division. . . .

It is appellant's contention that no consequential damages should have been awarded. In returning substantial verdicts for plaintiff it may be that the jury considered legally impermissible elements of such damages when it determined the total amount of damages. In the procedural posture in which the case reaches us it is impossible to determine whether the jury did in fact consider any such elements. . . . The jury returned lump sum general verdicts only on the four causes of action alleged in the complaint; no request was made for special verdicts or answers to written interrogatories. . . . Appellant has failed to pre-

serve for our review the law issues which it asserts underlie the factual determinations of which it now complains. The instructions given the jury ... are not a model of either clarity or completeness. However, ... defendant took no sufficient exception to the charge as given and did not otherwise assist the Trial Judge in clarifying or distilling the legal issues as to which it now seeks our review. In consequence ..., appellant has failed to preserve legal issues which we may consider.

*Hunt II*, 50 N.Y.2d at 940, 431 N.Y.S.2d 454, 409 N.E.2d 928.

A review of the *Hunt I* court's analysis of damage categories further reveals its inapplicability to the case at bar. For example, the damages ultimately awarded against the surety were damages for the "reduc[tion of] the sale price because of the failure of defendant to complete the construction." *Hunt I*, 73 A.D.2d at 798, 423 N.Y.S.2d 718. In justifying this award, the court concluded that an award of "loss of use" damages would have been appropriate against the surety, and allowed an award of loss-of-sale-value damages only because such damages amounted to less than the sum that would have been attributable to loss of rent. However, damages for "reduction of the sale price," rather than being a variation on delay damages, actually constitute the accepted alternative measure for computing standard "cost of completion damages"—that is, the "value" rather than "cost" method of computation, which substitutes (for the cost of completion) the difference between the value of the incomplete structure and the value the structure would have had if it had been completed in accordance with the original plans.[9] Therefore, any discussion by the *Hunt I* court of "loss of use" damages for surety-caused delay is at best dictum, since the actual damages under consideration were cost-of-completion

damages, and would have been appropriate without any reliance at all on the concept of loss of use damages.

Moreover, the *Hunt I* court neglected to differentiate between the various claims brought in the trial court on which the awards in this case were based—that is, between claims based on the performance bonds, and *separate* causes of action based on the letter of agreement wherein the surety agreed to complete the construction projects. The Appellate Division had earlier, in *Hunt v. Bankers and Shippers Ins. Co. of New York*, 60 A.D.2d 781, 783, 400 N.Y.S.2d 645 (4th Dep't 1977) ("*Hunt III*"), allowed the plaintiffs to plead and prove causes of action on the performance bonds as well as on the agreement letter, but then required them to make a selection between the claims before the entry of judgment. Apparently judgment was ultimately entered on the performance bond claims only. *Hunt I* at 797, 423 N.Y.S.2d 718. However, no distinction was made by the court as to which kind of damages might be appropriate for each of the separate actions—those for breach of the performance bonds, and those for breach of the letter agreement.

In light of the Appellate Division's failure to consider the language of the bond and to identify and distinguish the nature of the damages at issue, the failure of the Court of Appeals to review and consider the substantive conclusions of the appellate court, and the distinguishable fact pattern, I do not find the conclusions of the *Hunt I* case to be binding on the case at bar.

The other Fourth Department case to address the issue of a surety's liability, under a bond, for surety-caused delay damages is *International Fidelity Ins. Co. v. County of Chautauqua*, 245 A.D.2d 1056, 667 N.Y.S.2d 172 (4th Dep't 1997), which is directly on point. In *Chautau-*

---

9. *See Kidd*, 83 N.Y. 391 (discussing the alternative approaches); *Bellizzi v. Huntley Estates*, 1 A.D.2d 683, 683, 147 N.Y.S.2d 74 (2d Dep't 1955) (same, citing *Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921) and major contract treatises); Stein, ¶ 11.02[2][a][i].

*qua,* as in the case at bar, the county terminated the principal's right to complete the construction contract and demanded that the surety complete the work pursuant to the performance bond. The surety then retained another contractor, which completed the work a year and a half after the deadline established by the original contract. The court concluded that it could award the county not only liquidated damages for the delay caused by the *contractor,* but also actual lost revenues stemming from the *surety's* delay in completing the project. The court stated,

> The County's counterclaim against the bonding company arises out of the performance bond, not the original contract. By the terms of the bond, IFIC not only assumed the contractual obligations agreed to by its principal but expressly assumed obligations of its own, including the obligation to complete the contract "promptly." Further, IFIC expressly agreed, in the event of a breach of such obligations, to pay "[a]ddditional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety." We thus conclude that the County may recover actual damages, including lost income, attributable to the surety's alleged delay in completing the project.

*Chautauqua, id.* at 1057–58, 667 N.Y.S.2d 172.

The bond language quoted in the *Chautauqua* decision, related to "additional legal, design professional and delay costs . . . resulting from the actions or failure to act of the Surety," is identical to the language in the Bond before me. However, the *Chautauqua* court makes no mention of whether that bond also included a separate damage provision, such as that contained in ¶ 6.3 of the IFIC Bond, relating to "actual damages caused by delayed performance . . . of the Contractor." Thus, it is not clear whether the distinction between the damage provisions was simply not in that bond, or was there but was not

brought to the attention of the court. What is clear is that the court engaged in no analysis whatsoever of a central issue in this cae: specifically, the distinction in standard trade usage between "actual damages caused by delayed performance" on the one hand, and "additional legal, design professional and delay costs" on the other. Instead, it simply concluded, without analysis or citation, that the term "delay costs" encompasses lost income and related delay damages; and it took no note (if indeed the distinguishing provision was before it) of the distinction in liability that corresponds to the distinction in damages in the bond. Because the extensive literature and case law about the categorization of delay damages in construction law, as well as the New York case law counseling a strict interpretation of surety liability, appears to contradict this unsupported extension of liability by the *Chautauqua* court, I conclude that the case does not control the decision before me.

Moreover, while the *Chautauqua* court also concluded that "[b]y the terms of the bond, IFIC . . . expressly assumed obligations of its own, including the obligation to complete the contract 'promptly,'" other courts have reached a different conclusion about the nature of the obligation of the surety under the bond. Compare, for example, *Miracle Mile Shopping Ctr v. National Union Indem. Co.,* 299 F.2d 780, 783 and n. 1 (7th Cir.1962), concluding that the purpose of the time limitation in the Bond, during which the surety must either "take over and assume completion" of the contract or pay the owner the cost of completion, was to assure the owner that "if the contractor defaults, the *resumption* of construction would not be delayed." *Id.* (emphasis added).

 I believe the better interpretation of the surety's obligation to act "promptly" after default, at least in the IFIC Bond, is the obligation identified by *Miracle Mile*— that is, that the surety must either (1) promptly take one of the specified alternative steps necessary to initiate the steps

necessary *to resume construction,* or (2) notify the Owner that it will not do so and that the Owner should step in. The goal is to ensure that the *resumption* of construction will not be unduly delayed. In the case of a surety who chooses to implement option 4.3 under this Bond, the requirements of the obligation are laid out in great detail: the surety must "obtain" new bids, "arrange for a contract to be prepared" between the new contractor and the Owner, and "pay" the owner the damages specified in ¶ 6 of the Bond. But in the case of option 4.2, the option chosen by IFIC, the requirement is quite different: specifically, the surety must *"Undertake* to perform and complete the Construction Contract itself, through its agents or through independent contractors". Bond at ¶ 4.2 (emphasis added). The IFIC Bond does not require the surety "to perform and complete" the Construction Contract—something that might take years—but rather requires the surety to "undertake" to perform and complete. The definition of "undertake" is:

1. to take upon oneself; *agree* to do; *enter into* or upon (a task, journey, etc.)[;] 2. to *give a promise* or pledge that; *contract* [;] 3. to promise, guarantee[;] 4. to make oneself responsible for; *take over as a charge.*

*Webster's New World Dictionary* (2d College Ed.1984) (emphasis added). The obligation that the drafters imposed on a surety under the IFIC Bond was a very specific and limited one: to "agree" or "guarantee" to perform and complete; to *enter into* a commitment—that is, to "contract"; and to "take over" the completion obligation "as a charge." Once the surety has promptly *contracted* for and *entered into* its completion task—and certainly once it has actually "taken over" that com-

pletion under a formal takeover agreement and commenced the work—it has fulfilled its obligation under ¶ 4.2. If it then ultimately fails to satisfy the timeliness obligations it entered into under the new contract, the appropriate remedies can most appropriately be implemented under that new contract.

This interpretation is supported by ¶ 5 of the Bond, which states,

If the Surety does not proceed as provided in Paragraph 4 [the paragraph listing the Surety's options upon default] with reasonable promptness, the surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner.

Bond at ¶ 5. The clear intent of this paragraph is to force the surety to promptly step in and undertake one of the actions specified in ¶ 4—that is, to require it to *promptly respond in one of those ways to the default* so that resumption of construction is not unduly delayed—or, if it does not do so, to provide a procedure for the owner to quickly declare a default and make new arrangements with another contractor (without fear of breaching the now-terminated Bond). Once it has responded with one of the specified options, it has "proceed[ed] ... with reasonable promptness" under Paragraph 4, and has satisfied its obligations under the Bond. Under that interpretation, a failure to take such prompt action would constitute a breach of the Bond, allowing the owner to bring an action under it.[10] However, a delay of

---

**10.** As noted above, there are cases suggesting that if the surety entirely refuses to fulfill any of the options from which it may choose under a bond, it might be liable beyond the limits specified in the bond (which, arguably, could include kinds of damages not covered by the bond as well as amounts in excess of the penal limit). *See Continental Realty Corp.*

*v. Andrew J. Crevolin Co.,* 380 F.Supp. 246 (S.D.W.Va.1974); *Miracle Mile,* 299 F.2d 780. However, the Second Circuit has concluded that such an extension of liability would not be justified where the surety's breach led to no separate, additional injury, leaving unclear the answer as to what finding might be appropriate if such separate and additional injury

months or even years in timely *completing* the project, under a timetable established in a separate takeover agreement, would breach only the Takeover Agreement, not the Bond itself. An action based on such delay would appropriately be brought under the takeover agreement, not under the bond.

In sum, based upon the language of the IFIC Bond, read in the context of the entire agreement and in light of the usages and terminology as generally understood in the construction industry—and particularly in light of New York case law strictly limiting sureties' obligations to the boundaries of liability articulated in surety bonds—I conclude that the damage provisions in ¶ 6.3 unambiguously obligate the Surety for "loss of use" and related delay damage claims that are caused by delayed performance of the Contractor, but do not obligate the Surety for such damages when they are caused by the surety's delay in ultimately completing the project after takeover. Consequently, the claim brought by the County against IFIC for the delay damages *caused by NANCO's delay* is a claim for which IFIC is obligated by the Bond, and therefore constitutes an action "under" the Bond. However, the County's claim against IFIC for delay damages *caused by IFIC's own delayed performance* in completing the contract after takeover is not a claim encompassed under the Bond. The Bond does not obligate IFIC for payment of such damages, and provides no basis for an action against IFIC "under" the Bond on those grounds. Consequently, that claim does not constitute an action "under" the Bond. IFIC and the County came into privity under the Takeover Agreement, in which IFIC agreed to take on the responsibilities of the Contractor under the original Construction Contract, and the County may therefore bring an action for these damages against IFIC. That action is, of necessity, a proceeding *under the Takeover Agreement,* for damages caused by IFIC's

were shown. *United States v. Seaboard Surety*

delayed performance under that Agreement and the incorporated Construction Contract.

This analysis, based primarily on the language of the Bond, makes sense from a business and economic-efficiency perspective as well. *See, e.g., Shirai v. Blum,* 239 N.Y. 172, 146 N.E. 194 (1924) ("the language of a business contract must be construed in the light of what a business man would reasonably expect to give or receive, to perform or suffer, under its terms" (page reference not available)); *Outlet Embroidery Co. v. Derwent Mills,* 254 N.Y. 179, 183, 172 N.E. 462 (1930) ("In the transactions of business life, sanity of end and aim is at least a presumption, albeit subject to be rebutted"). The purpose of the bond arrangement is not only to provide financial resources to reimburse any potential damage to the owner resulting from contractor default, but also to provide an effective mechanism and incentive for the surety—or if necessary, the owner—to step in and resolve a default *promptly,* so that there is the least possible waste due to "downtime" before construction resumes. *See, e.g.,* Robert F. Cushman, et al, *Handling Fidelity, Surety, and Financial Risk Claims* ("Handling Surety Claims") (2d ed.1990) at 113 (upon default by contractor and demand by obligee for performance, "the surety must investigate the matter as rapidly as possible to avoid additional exposure and risk"). Even if the surety chooses the option of denying liability, it is important, in order to protect the owner, for that decision to be communicated quickly, so that the owner may immediately undertake the steps necessary to find a replacement contractor.

It is equally important to provide an incentive for the *owner* to act quickly, even where a surety has completely refused to act. The careful apportionment of delay damages can provide such an incentive. Delay damages, as the claim in this case demonstrates, can amount to a substantial sum of money. If a bond permitted an

*Co.,* 817 F.2d 956, 964 (2d Cir.1987).

owner to collect from the surety actual delay damages for the entire period during which a construction project was suspended—not just for the period of delay that is clearly necessary to recover from the *contractor's* default, but also for a much more extended period that could arguably be attributed to the surety's subsequent inaction (such as a period of unsuccessful negotiations with, or litigation against, the surety)—then the owner would have little incentive to move quickly to resume construction. The presumptive burden of delay damages would pile up on the surety, which might conclude that it was not liable under the circumstances of the alleged default. It makes more sense from an efficiency perspective to encourage the owner—who is in the best position to resume the project—to (1) do so immediately (thereby reducing additional delay damage), and (2) simultaneously begin an action against the surety for the unavoidable excess construction costs (and contractor-caused delay damages) for which the surety is obligated under the bond. Requiring the owner to be responsible for the delay damages that accrue beyond the time reasonably attributable to the contractor's default is an effective tool for creating such an incentive.

If, on the other hand, the surety chooses to step into the contractor's shoes and complete the contract—a step which would satisfy and conclude its elective obligation under this Bond to "undertake to perform and complete"—it will perform and (hopefully) complete under a new contract between it and the owner. *Handling Surety Claims* at 127 ("In most takeover agreements the surety enters into a new agreement with the owner to complete the project in accord with the construction contract's requirements, and the owner agrees to pay the surety the contract funds"); Bruce C. King, *Takeover and Completion of Bonded Contracts by the Survey* [sic] ("Takeover and Completion"), 27–FALL Brief 22, 25–28 (American Bar Association, 1997) (explaining that a surety's takeover of a construction con-

tract, and the reletting of the job to a completion contractor, requires a written agreement between surety and obligee, and providing lists of issues and terms that should be included within such a takeover agreement). That new contract, which should include specific terms addressing the future apportionment of responsibilities between the parties, *id.*, will control the terms of the new relationship, just as would be the case if another contractor took over the contract. Because, under that takeover contract, the surety changes its role to that of a contractor, it will be liable, as all construction contractors are, for all damages that flow naturally from the breach, *see Kidd*, 83 N.Y. 391; *see* discussion of damages, *supra*, unless it negotiates, as an element of the takeover agreement, some limitation to those responsibilities. *Handling Surety Claims* at 127–29; *Takeover and Completion* at 25–28. That would include, in the case of delayed completion, any actual damages caused by its own delayed performance. *Takeover and Completion, id.* This also makes sense in a business context, because otherwise the owner, by allowing the surety to choose the takeover option, would be giving up the entitlement it would otherwise have, under the other completion options, to collect delay damages for any delay in completion caused by the new completing contractor. *Cf. Comey*, 217 N.Y. at 272, 111 N.E. 832 (refusing to interpret new contract, entered into after initial contractor's default, to evidence obligee's willingness to give away his right of action against the surety for excess completion costs).

In sum, construction surety bonds like this one, and actions brought under such bonds, are designed to address, and remedy, the immediate consequences of a failure to perform by the original contractor—that is, to require the surety to promptly take over the contract, arrange for a new contractor, or pay, and to provide an incentive for the owner to act quickly if the surety fails to do so. Once a

new contractor has been hired—whether that new contractor is the surety itself, or another construction company—the bond relationship ends (except to the extent that the new takeover agreement specifically incorporates a particular provision of the bond), and a new contractual relationship (under a takeover agreement) supplants it.

### C. *The Limitations Provision*

The time limit for instituting an action under the Bond is stated in ¶ 9 of the Bond, and is quoted at page 13, *supra.* That limitations provision, which must be reasonable, accords with this Court's analysis of the remainder of the Bond. The element of that provision that raises questions about its "reasonableness" is the term permitting the two-year limitations period to run as soon as the *contractor* defaults or ceases work, even though it might be the *surety's* breach that forms the basis of an owner's action. If a surety's failure, several years down the road, to *complete* the project on time constituted an action "under" the Bond that was subject to the time limitations of ¶ 9, a scenario might arise in which the surety's breach did not occur, and therefore a cause of action did not accrue, until after the time for initiating an action had passed. However, under New York law a cause of action accrues, and the statute of limitations begins to run, from the time the breach occurs. *See, e.g., John J. Kassner & Co., Inc. v. City of New York,* 46 N.Y.2d 544, 548, 415 N.Y.S.2d 785, 389 N.E.2d 99 (1979). Thus, a limitations provision that expired before the cause of action accrued might be considered unreasonable under New York law, and it therefore might be invalid.

However, if actions "under" the Bond are limited to those actions arising out of (1) the Contractor's default (and the surety's reimbursement obligation therefor), or (2) the refusal or failure of the Surety to promptly respond by taking the short-term steps outlined in ¶ 4, then the limitations provision makes sense. It *would* be rea-

sonable to promptly start the clock running on *these* actions, which by their nature must be taken, or defaulted upon, within a very short time period. The date of contractor default—or the date not long after that default by which the Surety is obligated to take action—are reasonable starting dates for the limitations period precisely because a default initiates a sequence (or choice) of obligations which must be satisfied "promptly." The owner will know very quickly if there are damages to be remedied. The owner will also, because of the time limitations on the surety's response, know very quickly whether the surety has satisfied its obligations, and, if not, will know that the owner must step in and undertake the corrective actions itself. If the owner must hire a new third-party contractor at a higher price, the new contract price will be all the evidence of "excess cost of completion" that the owner requires to initiate suit. *See McKegney v. Illinois Surety Co.,* 180 A.D. 507, 509, 167 N.Y.S. 843 (1st Dep't 1917). If the surety denies liability or refuses to act promptly under the bond, necessitating legal action, the owner will also know about that "promptly," so the owner can reasonably be required to bring such an action within two years.

If, on the other hand, the surety undertakes to complete the contract itself, the new relationship between the surety and the owner will be governed by the new contract or takeover agreement, with the former surety now acting directly as the new contractor. That agreement will be subject to either its own limitations provision, one incorporated from the underlying contract, or the New York statute of limitations on contract actions. *See, e.g., American Trading Co., Inc. v. Fish,* 42 N.Y.2d 20, 396 N.Y.S.2d 617, 364 N.E.2d 1309 (1977) (surety contracts are separate and distinct from the contracts with which the surety's guarantee may be associated, and different limitations periods apply). This analysis is also consistent with the ruling of the New York Court of Appeals

in *Comey*, 217 N.Y. at 277, 111 N.E. 832, which emphasized that, in actions in which a surety raises the bond limitations provision as a defense,

> [t]he language of the bond is the [defendant surety's], the general law of limitations is not to be readily displaced, and words of doubtful meaning must be construed in favor of the plaintiff.

*Id.*

■ For these reasons, I conclude that the claim brought by the County against IFIC for the delay damages *caused by NANCO's delay*—which is an action "under" the Bond—is subject to the time limitations expressed in ¶ 9 of the Bond. However, the County's claim against IFIC for delay damages *caused by IFIC's own delayed performance of the Completion Contract* is not an action "under" the Bond, and as a result, it is not subject to the time limitations of ¶ 9. Rather, it is governed by any time limitations specified in the Takeover Agreement (of which there are none), or in the Construction Contract, which is incorporated by reference into the Takeover Agreement [11], or, alternatively, by the New York statute of limitations.

### D. Are the Actions Barred?

■ Because the claim for NANCO-caused damages was brought more than two years after NANCO's default, that claim is time-barred, except to the extent that it constitutes a setoff against IFIC's claims. As discussed above, the County argues that the word "IFIC" should be substituted for "Contractor" in the limitations provision—thereby extending the deadline date to a date two years from the time of IFIC's default, rather than NANCO's—but that argument cannot possibly apply to the portion of the claim based on damages caused by NANCO. Even if one were to consider substituting IFIC as "Contractor" under the Bond for the purpose of any covered default that took place after IFIC stepped into NANCO's shoes under the Construction Contract,[12] there could be no reasonable basis for substituting IFIC as Contractor for the purpose of actions based upon NANCO's default, which took place before any substitution of parties took place. The Bond explicitly identified NANCO, on its signature page, as "Contractor." That designation must, at a minimum, have applied during the time when NANCO was indisputably fulfilling the role of Contractor. The designation of NANCO as "Contractor" on the

11. The Construction Contract contains a limitations provision in ¶ 13.7 which will be discussed below.

12. If, for example, a claim based on IFIC's actions *after it stepped in as Contractor* hypothetically "arose" under the Bond, one could conclude that "IFIC" should be substituted for "Contractor" in the limitations provision for purposes of those claims. The Definitions paragraph of the Bond (*id.* at ¶ 12) defines "Construction Contract" as "The agreement between the Owner and the Contractor *identified on the signature page*" (*id.*, emphasis added); yet it defines "Contractor Default," only as the "failure of the Contractor" to perform the Construction Contract, with no corresponding limitation to the Contractor *identified on the signature page.* This distinction in wording suggests that the identity of the "Contractor" for purposes of Contractor Default is not necessarily limited to the Contractor named on the signature page of the bond, and could instead refer to whichever entity was responsible for performing the Construction Contract—including, in this case (after October 1994), IFIC. In addition, since this Bond is a standard AIA document, in which "the terms used were meant to have a consistent meaning throughout the documents," *Whitacre Construction Specialties, Inc. v. Aetna Casualty & Surety Co.,* 86 A.D.2d 972, 448 N.Y.S.2d 287 (4th Dep't), *aff'd,* 57 N.Y.2d 1018, 457 N.Y.S.2d 479, 443 N.E.2d 953 (1982), the definition of "Contractor" in the AIA's Glossary of Construction Industry Terms ("AIA Glossary") also gives insight into the meaning of that term. *Whitacre, id.* (citing AIA Glossary, included in AIA, Architect's Handbook of Professional Practice (1991 ed.)). The AIA Glossary defines Contractor as "(1) One who enters into a contract. (2) In construction terminology, the person or entity responsible for performing the Work under the Contract for Construction." This definition arguably leaves room for the substitution of IFIC as the "Contractor" once IFIC stepped into NANCO's shoes.

Bond requires that NANCO be accepted for the purpose of actions based upon its own default, which took place before the Takeover Agreement existed.

In addition, such a substitution would violate IFIC's rights under the Bond as reserved by the Takeover Agreement. At the time the parties entered into the Takeover Agreement, the Bond's limitation period had already begun to run (effective on August 4, 1994, the date of NANCO's default) for any claims brought by the County for delay costs or damages resulting from NANCO's default. Thus, IFIC already had the existing right under the Bond to enforce against the County an August 4, 1996, deadline for the institution of any proceeding against IFIC based upon such claims. Any substitution of wording that extended the County's deadline would violate IFIC's reservation, in ¶ 4 of the Takeover Agreement, of "its rights and defenses with respect to any . . . claims" brought under the Performance Bond, and would also violate the agreement not to "alter, affect, or vary the rights and obligations of the parties" under the Bond. Takeover Agreement at ¶ 6. In sum, IFIC's already-existing right to invoke an August 1996 deadline against claims based on NANCO-caused delay damages was reserved in the Takeover Agreement. The County's claims were not instituted until May 21, 1997; therefore, with the exception of the limited right of offset against IFIC's claims, the portion of the County's claim based upon damages caused by NANCO's breach is barred.

However, the County's claim against IFIC for delay damages caused by IFIC's own delayed performance of the Completion Contract is not barred. Since that claim is not a proceeding "under" the Bond, it is not subject to the time limitations of ¶ 9. Nor are any time limitations specified in the Takeover Agreement. Thus, the only possible limitations periods applicable to the claim would be either the six-year period specified in the New York statute of limitations on contract actions, N.Y. C.P.L.R. § 213, or the limitations period prescribed by ¶ 13.7 of the Construction Contract, which is incorporated by reference into the Takeover Agreement. Regardless of which limitation period applies, this cause of action is not time-barred. With respect to the limitations period in the Contract, neither party has suggested, either when this Court raised the issue at oral argument or at any time before or since then, that the provision bars this action. In any event, even if it were raised, I conclude that the claims raised here were timely under that provision. *See* Contract at ¶ 13.7.

Alternatively, the six-year statute of limitations would apply to the claims for IFIC-caused delay damages. Since the earliest date of default alleged by anyone in this action is August 4, 1994, claims based on IFIC-caused delay—which were interposed in May of 1997—are timely.

## II. Source of Damages

██ The factual record before me on the issue of causation, although quite substantial, is nevertheless insufficient to allow me to determine precisely which delay damages can be attributed to NANCO, and which to IFIC, either through its own actions, or derivatively through the actions of Hirani. However, the submissions are sufficiently developed to allow me to outline the considerations that govern that decision, and to make a tentative determination as to that apportionment—subject, of course, to modification based on additional relevant evidence that might be presented at trial. Because this issue will be seriously disputed at trial, it is appropriate to address it here.

The damages due to the actions or omissions of NANCO presumptively include the damages that began accruing on August 8, 1994 (the date by which the project should have been substantially completed by NANCO)[13] and that contin-

---

**13.** "Substantial Completion" is defined in the

Contract as "the stage in the progress of the

ued to accrue until February 21, 1995 (the date on which the Completion Contract called for Hirani to complete all work on the Contract). It appears that any delay damages that accrued during this period, as a result of the County's inability to move into the facility, may be attributed to NANCO's default of its obligations under the Construction Contract, not to any breach or default by IFIC or Hirani. This is apparent because the County has not identified any breach or default by IFIC or Hirani during that period that significantly delayed the resumption of construction. Thus, it is reasonable to assume that the February 21, 1995, completion date represents the earliest date under which a completion contractor could have been expected to complete the contract, given the inevitable delay in resumption caused by NANCO's default and the resulting need to find a new contractor. Although the County asserts that it was not happy with IFIC's choice of Hirani as Completion Contractor, the County does not identify any provision of the Bond that was allegedly breached by IFIC's choice. Moreover, while the County makes some general complaints about the process by which Hirani was chosen, the County does not assert that IFIC failed to proceed with the speed necessary to meet its obligations, under ¶ 4 of the Bond, to "promptly" exercise one of its options under that paragraph. In any event, the County never took the steps required under ¶ 5 to establish any such default by IFIC.

The County also does not argue that IFIC breached the *Takeover Agreement* before February 21, 1995, the date of completion specified under the Completion Contract. Rather, it appears undisputed that the parties moved with due speed in

signing a contract and setting the new completion date; most importantly, there is no suggestion that any earlier completion date would have been practical. If this was the earliest practical completion date, in light of the arrangements that had to be made as a result of NANCO's default, then it would be illogical to attribute any delay damages accruing *before* that completion date to anyone but NANCO.

The second set of asserted delay damages began accruing on February 21, 1995—the earliest date under which IFIC, through its Completion Contractor Hirani, can be said to have first breached its obligation under the Takeover Agreement and Completion Contract to timely complete the work. The damages ceased to accrue, according to the County's claim, when the facility was certified for occupancy in November of 1995.

 The damages between February and November of 1995 can most logically be described as resulting from IFIC's failure to satisfy the obligations it undertook to complete the Construction Contract by February 21, 1995. It appears that IFIC, Hirani, and the County all agreed, by their assent to the Takeover Agreement and the corresponding Completion Contract, that the completion of the work within 120 days of signing those contracts—that is, by February 21, 1995—would satisfy the terms of those contracts. *See* Takeover Agreement at ¶ 4; Completion Contract at ¶ 4.[14] Thus, had IFIC, through Hirani, actually substantially completed the work on February 21 and paved the way for the County to move into the building on that date, any delay damages would have stopped on that date—and they would, most logically, have constituted damages

Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the work for its intended use." Contract at 29, ¶ 9.8.1

**14.** While the language of the Takeover Agreement is not crystal clear on this point, this

reading appears to be the most logical interpretation of the Agreement's time-related provisions. Because there is some room for doubt on this point, however, I will consider any meaningful extrinsic evidence that the parties may be able to present at trial that addresses these provisions.

caused by NANCO's breach. However, it is equally clear that any failure by IFIC and Hirani to meet that deadline would constitute *their own* breach, and would start the clock running on damages caused not by the acts or omissions of NANCO, but of IFIC and Hirani.

### III. The Penal Limits Under the Bond Do Not Apply to Actions Under the Takeover Agreement.

■ Because the action against IFIC for delay damages caused by its own delayed performance is brought under the Takeover Agreement, not under the Bond, the penal limit of the Bond does not apply.

This conclusion does not depend upon the nature of the action as one under the Takeover Agreement rather than one under the Bond. The Bond does not contain any limit on the amount of surety-caused delay damage for which the Surety is responsible; the provision limiting the Surety's obligation "to the limit of the amount of this Bond" only addresses completion costs and Contractor-caused delay damages. Bond at ¶ 6. Thus, even if this action for delay damages arguably fell under the Bond, the penal limit would not apply.

More importantly, however, long-established case law holds that a surety's takeover of its principal's contract pursuant to a performance bond always subjects the surety to liability beyond the penal limit of the bond. Courts have reached this conclusion even in cases in which no analysis has been undertaken as to whether the surety's liability, upon taking over the contract, arises under the bond or separately under a completion contract. *See McWaters and Bartlett v. United States,* 272 F.2d 291, 295 (10th Cir.1959) (because the surety on the performance bond agreed to complete the contract, "[t]hat would, of course, subject [the surety] to full liability for all amounts incurred in furnishing labor and material in the completion of the job, irrespective of the $69,000 liability limitation in its bond.... [B]y such action [the surety] waived the penalty limitation

of its bond" (citing, *inter alia,* 43 Am.Jur., Page 947, § 204)); *Continental Realty Corp. v. Andrew J. Crevolin Co.,* 380 F.Supp. 246 (S.D.W.Va.1974) (surety may "take over and assume completion of the contract and thereby become entitled to payments, if any, of the balance of the contract price, in which event it could not reasonably be argued that the limit of its responsibility was up to . . . the penal sum of the bond, for the completion of the contract might well have exceeded that sum" (citing *McWaters,* 272 F.2d 291)); *see also Village of Fox Lake v. Aetna Cas. & Sur. Co.,* 178 Ill.App.3d 887, 128 Ill.Dec. 113, 534 N.E.2d 133, 146 (1989), *appeal denied,* 126 Ill.2d 558, 133 Ill.Dec. 678, 541 N.E.2d 1116 (1989) (surety and court agreed that if the surety had chosen to take over and perform the contract, surety would "be liable for more than the penal bond if, in performing the contract, the cost of the performance totaled more than the sum of the bond").

In short, there is a distinction in liability between, on the one hand, those cases in which the surety takes over completion of the contract by stepping into the shoes of the contractor—in which case the surety's liability is equal to what the contractor's liability would be—and, on the other hand, those cases in which the surety chooses simply to "pay off" its obligation to the obligee (or deny liability), in which case its liability is generally limited to the penal sum of the bond. The sureties in this action have failed to acknowledge that distinction. For example, the sureties rely on a Fifth Circuit case, *Bill Curphy Co. v. Elliott,* 207 F.2d 103 (5th Cir.1953), for the proposition that no recovery can be had on a bond beyond the penalty named in the bond. However, the Fifth Circuit applied that rule where the surety was alleged to have breached its obligation under the bond by refusing either to pay or complete, not where it had elected to take over and complete the contract.

The distinction holds true under New York law as well. New York General Obligations Law § 7–301 states:

> When any undertaking executed within or without the state specifies that it is to be void upon payment of an amount or performance of an act, the undertaking shall be deemed to contain a covenant *either* to pay the amount *or* to perform the act specified. *In the event of payment,* the amount recoverable from a surety shall not exceed the amount specified in the undertaking except that interest in addition to this amount shall be awarded from the time of default by the surety.

*Id.* (emphasis added). This statute specifically limits a surety's liability to the penal sum of the bond *if it chooses to pay rather than to perform,* but it establishes no such limit on liability in the event that a surety chooses to perform rather than pay. *See also Wilson v. Moon,* 240 A.D. 440, 270 N.Y.S. 859 (4th Dep't), *aff'd,* 265 N.Y. 640, 193 N.E. 423 (1934) (surety who completes contract of principal stands in principal's shoes, and its obligations under the contract are the same as those of the principal and are measured by the construction contract); *Carpenter's Backhoe & Dozer Service, Inc. v. Dewittsburg Hous. Dev. Fund Corp.,* 66 A.D.2d 916, 410 N.Y.S.2d 717 (3d Dep't 1978) (same).

The sureties argue that there is no justification for allowing a surety's liability, in the event that it undertakes to complete a project, to exceed the maximum liability to which it would be exposed if it chooses to pay, or even if it *refuses* to pay. However, there is good reason to make precisely this kind of distinction in liability. Although the loss of the protection provided to the surety by the penal bond limit is a substantial disadvantage to the surety, a compensating advantage is provided by the fact that the surety, in taking over the project, is in control of completion costs. *See* 2 G.M. Stein, *Construction Law* ¶ 17.07[8][a]. "Electing to allow the owner to hire a contractor and paying the owner

damages usually results in the highest completion costs for the surety because the surety ha[s] no control over completion costs." *Id.* Thus, the option of taking over completion is one that may be worth choosing in order for the surety to have the chance to reduce its potential cost. Also of concern is the issue of fairness to the bond's obligee. By taking control of construction expenditures away from the obligee, a surety that takes over the construction contract could increase the risk to the obligee, if the penal bond limit on the surety's potential loss were not removed. This is true because, if the surety's total exposure was limited to the penal sum of the bond—regardless of the actual construction cost or amount of delay—there would be no incentive for the surety to keep costs low, or even to complete on time. It makes better sense to keep the burden of liability on the best cost-avoider—that is, on the surety, who has control of the work, of the expenditures, and of the pace of construction.

Because the takeover procedure removes the automatic protection of the bond's penal limit, commentators have suggested mechanisms that the surety may use to protect itself. For example,

> To avoid liability in excess of the bond amount, ... the surety must include a clause in the takeover agreement which limits the surety's liability in the course of performance to the original bond penalty. *Although the obligee is not required to accept such a limitation,* there are instances (especially where the work is virtually complete) where the obligee will consent to such a limitation. The takeover agreement should also provide that all sums spent pursuant to it by the surety are to be deducted from the penal sum .... In arranging for completion of the principal's work, the surety might try to impose liability for completion on the relet contractor and its surety. The inclusion of provisions in the relet agreement which allocate the responsibility for liquidated damages [the alternative

to actual delay damages], ... and require the relet contractor to obtain a surety bond in favor of the completing surety and the obligee are intended to eliminate the risk the surety will incur for unexpected costs of completion in excess of the bond penalty.

Bruce C. King, *Takeover and Completion of Bonded Contracts by the Survey* [sic], 27–FALL Brief 22, 27–28 (1997) (emphasis added).

In this case IFIC did insert certain limitations into the Takeover Agreement,[15] but the Agreement did not include an absolute limitation on liability to the penal sum of the bond. Nor is there any limitation regarding liability for delay damages caused by the surety's delayed performance of the Takeover Agreement. The Agreement does state that "The Obligee reserves any and all of its rights to assert a claim under the Performance Bond for delay or other damages and Surety reserves any and all of its rights and defenses with respect to any such claims." *Id.* at ¶ 4. However, the Bond did not address surety-caused delay damages, and since it provided no defenses to such claims, there were no defenses for IFIC to reserve.[16]

Paragraph 6 of the Bond does provide that "if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract," Bond at ¶ 6, and this right or defense was certainly reserved for IFIC's benefit by the Takeover Agreement provisions. However, no party has provided evidence of any contractual limitation, under the Construction Contract, on the Contractor's liability for damages caused by its own delay. Therefore, the Contractor, under New York law, would be responsible, without limitation, for all proven damages caused by its own delay under the Construction Contract; thus, IFIC became equally responsible for such damages, caused by its own delay, when it stepped into the Contractor's shoes.

IFIC did, however, endeavor to limit its losses by including an indemnification provision in the Completion Contract, which obligates Hirani to indemnify IFIC for claims brought against IFIC by the County, and by requiring Hirani to obtain a performance bond in IFIC's favor. That bond, provided by F. & G (the "F & G Bond"), insured IFIC against damages caused by Hirani's failure to perform. F & G is now contesting its liability under that bond, and that dispute will be discussed below.

For these reasons, I conclude that IFIC's liability for damages caused by its own delay is not limited to the penal sum of the Bond, and IFIC's motion for summary judgment requesting such a limitation is denied.

## IV. Disposition of the Funds Constituting the Balance of the Contract Price.

■ IFIC alleges that the County did not have the right under the Takeover Agreement, during construction of the facility, to withhold any funds from the County's progress payments to IFIC because of IFIC's or Hirani's delay in com-

---

**15.** The Takeover Agreement does contain a clause that the "Surety is taking over this Contract pursuant to its obligation under its performance bond and that to the extent that Surety advances funds for the completion of the Contract which are not reimbursed by the Obligee, Surety shall be entitled to a reduction of the penal amount of Surety's performance bond." Takeover Agreement at ¶ 5. However, the dispute here is not about funds advanced by the Surety to complete the contract; it is about loss of income to the County,

and the extent to which the IFIC must reimburse them for that loss.

**16.** Paragraph 6 of the IFIC Bond provides that "To the limit of the amount of this Bond, ... the Surety is obligated without duplication for ... actual damages caused by delayed performance or non-performance of the Contractor," but it provides no corresponding limit on delay damages caused by delayed performance of the Surety.

pletion of the project. Therefore, IFIC asserts, this Court should immediately award to it, on summary judgment, all funds (constituting the remaining balance of the initial contract price) that IFIC says are due to it from the County. These funds, IFIC alleges, amount to $110,-955.90.

Since I have concluded that the County still has a valid claim against IFIC for IFIC-caused delay damages, and since the value of that claim presumptively amounts to substantially more than the funds IFIC claims are due to it under the balance of the contract price, it would be the better course of action, even if IFIC's right to the funds were conclusively established, to reserve any award of funds until a final accounting and setoff of all claims can be made.[17]

I also reject IFIC's argument that the County had no right to withhold funds from the balance of the contract price. The Takeover Agreement, which incorporates the Construction Contract by reference, says that the "Balance of the Contract Price, shall be paid directly to Surety for completion of the Contract *in accordance with the payment terms of the Contract.*" *Id.* at ¶ 4 (emphasis added). The payment terms of the Contract provide, *inter alia,* that payment may be withheld to protect the Owner from loss because of "reasonable evidence that the work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay". Construction Contract at ¶ 9.5.1.6. The Takeover Agreement also states that "the Obligee will not make any deduction from the Balance of the Contract Price to be paid to the Surety for delay damages in the completion of the Contract and for any delay prior to one hundred and twenty (120) calendar days following the date of this Agreement." *Id.* at ¶ 4. There is no

dispute that the County waited 120 days from the date of the Agreement before it made any deduction. Although the language of this sentence is not crystal clear—in fact, the parties at oral argument said that they had "agreed to disagree" about its meaning at the time the Takeover Agreement was negotiated—it cannot be said, as a matter of law, that the County's deduction of funds after the passage of the 120–day period constituted a violation of this clause of the Takeover Agreement. In light of the language of the Takeover Agreement and the Contract, I conclude that IFIC has failed to establish that the County's deductions violated the agreements between the parties. Therefore, IFIC's motion to immediately award to it the full amount of all moneys withheld by the County is denied.

### F & G's Summary Judgment Motion Against IFIC

As noted, defendant F & G provided the performance bond (the "F & G Bond"), under which IFIC was named as obligee, that insured the performance of Hirani, the completion contractor that IFIC hired to complete the project after NANCO had defaulted. IFIC has brought "claims over" against F & G, demanding that F & G reimburse IFIC for any money IFIC may ultimately owe to the County because of Hirani's construction delays.

In its summary judgment motion, F & G asks this Court (1) to dismiss any "claims over" that IFIC may ultimately bring against F & G, because IFIC assertedly failed to comply with certain conditions precedent in the F & G Bond; and (2) if those claims over are not dismissed, to limit F & G's liability to IFIC to (a) a sum that does not exceed the penal sum of the F & G's Bond, as well as (b) to damages that accrued only after the February 21, 1995, completion date specified in the Completion Contract between IFIC and

---

**17.** The County also retains an offset, against IFIC's claims, for the County's untimely counterclaims for NANCO-caused delay damages.

Hirani. For the reasons set forth below, I conclude that F & G's motion to dismiss should be denied, F & G's motion to limit its liability to the penal sum of the F & G Bond should be granted, and . F & G's motion to limit any damages to those that accrued after February 21, 1995, should be denied at this time, with leave to renew at the end of trial, pending the presentation of any additional evidence addressing the most appropriate date for division of liability between NANCO and F & G/Hirani.

## I. IFIC's Alleged Failure to Comply with Conditions Precedent in the F & G Bond.

█ F & G asserts that its entire obligation under the F & G Bond is predicated upon IFIC's obligation to comply with what F & G calls certain "conditions precedent" contained in Paragraph 3 of the F & G Bond. The F & G Bond—also an AIA Document A312–1984—includes the following language:

1. The Contractor [Hirani] and the Surety [F & G], jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner [IFIC] for the performance of the Construction Contract [the Completion Contract between IFIC & Hirani], which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety . . . that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss

methods of performing the Construction Contract. . . .

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. . .; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety . . . or to a contractor selected to perform the Construction Contract . . .

4. When the Owner has satisfied the conditions of Paragraph 3, the surety shall promptly and at the Surety's expense take one of the [previously described] actions [ (1) arranging for the Contractor to perform and complete, (2) undertaking to perform and complete the Contract, (3) arranging for a new contractor to contract directly with the Owner to complete and having the Surety pay to the Owner the damages described in Paragraph 6, or (4) waiving those three choices and promptly tendering payment to the Owner or formally denying liability ]:

F & G contends that the statement in ¶ 3 that "the Surety's obligation under this Bond shall arise after" the actions in the subparagraphs are taken, indicates that IFIC's completion of *all* steps listed in subparagraphs 3.1—3.3 is a condition precedent to the invocation of *any* of F & G's obligations under the F & G Bond—whether that obligation is to engage in one of the acts specified in ¶ 4, or simply to indemnify IFIC for any claims ultimately asserted by the County. F & G claims that a failure by IFIC to complete any of the ¶ 3 steps, or at least those relating to formal declaration of default and termination, releases F & G from any and all liability, of any kind, that it might otherwise have under the F & G Bond. Therefore, F & G concludes, since IFIC did not declare Hirani in default or formally terminate the Completion Contract—but rather continued to employ Hirani until the project was substantially completed—F & G is not obligated to indemnify IFIC for any claims for delay

damages brought against it by the County due to Hirani's delayed performance of the Contract.

IFIC, on the other hand, concedes that it did not formally terminate the Contract, but argues that a formal termination was not a condition precedent to F & G's obligation simply to *indemnify* IFIC for delay damage claims that the County might ultimately bring against it. Instead, IFIC argues, the default-and-termination requirements specified in ¶ 3 apply only to situations in which the obligee intends to call upon the surety to undertake the affirmative actions listed in ¶ 4—such as, for example, taking over the construction contract, arranging for another contractor to take it over, or immediately paying the obligee the funds necessary to allow the obligee to do so. The default-and-termination procedure is not, IFIC argues, a condition precedent to bringing a legal action on the F & G Bond for delay damages caused by the delayed performance of F & G's principal. The inappropriateness of such a requirement, IFIC adds, is particularly clear here, where the County allegedly did not even serve IFIC with the County's first formal demand for delay damages until September 25, 1995, just a few days before the County accepted the project as substantially complete.[18]

F & G's obligation to indemnify IFIC comes not just from the F & G Bond, which in Paragraph 6 obligates the Surety for "actual damages caused by delayed performance or non-performance of the Contractor," F & G Bond at ¶ 6.3, but also from the Completion Contract that is incorporated within the F & G Bond by reference. A surety bond "attaches to the principal contract and must be construed with it." *Carrols Equities Corp. v. Villnave*, 57 A.D.2d 1044, 1045, 395 N.Y.S.2d 800 (4th Dep't 1977). The Completion Contract states:

4. *Completion and Liquidated Damages.* The Completion Contractor [Hirani] agrees that it shall complete all work on the Contract on or before one hundred and twenty (120) days from the date of the Takeover Agreement, or any extended date approved by the Owner [the County]. The Completion Contractor agrees that it shall be solely responsible to reimburse the Surety [IFIC] for any liquidated or other damages for delay as may be claimed or assessed by the [County] due to the Completion Contractor's failure to complete the Contract within said time period.

Completion Contract at ¶ 4.

The question, then, is not only whether the words in ¶ 3 of the F & G Bond are written in such a way that the ¶ 3 acts constitute a condition precedent at all, but whether, even if they do, they constitute a condition precedent to any and all obligations for which F & G might be liable—including indemnification for delay claims brought by the County against IFIC—as opposed to simply a condition precedent to the acts listed in ¶ 4 of the F & G Bond.

I conclude that completion of the acts in ¶ 3 does not constitute a condition precedent to F & G's liability to indemnify IFIC for delay claims, or to the ability of IFIC to bring a legal action against F & G for such claims. There may be reasons, relating to both the overall wording of the contract and the practicalities of construction projects, why the ¶ 3 steps might generally constitute conditions precedent to enforcement of the affirmative ¶ 4 obligations, but that decision need not be made in this case. Based on the wording of ¶ 3, the structure of the first three paragraphs of the F & G Bond, the logic and logistics of indemnification, and New York precedent, there is no reason to conclude that the steps outlined in ¶ 3 constitute conditions precedent to F & G's liability for indemnification.

---

**18.** F & G has argued that once a project is accepted as substantially complete, no declaration of default or termination is possible.

The introductory words of ¶3—those that F & G contends constitute a condition precedent—are not written in such a way that they excuse F & G's performance of the Completion Contract's indemnification provision if IFIC does not perform the steps listed below them. In *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995), the New York Court of Appeals summarized the law on conditions precedent. The court explained,

> A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises..... Conditions can be express or implied. Express conditions are those agreed to and imposed by the parties themselves. Implied or constructive conditions are those imposed by law to do justice. Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient....

> In determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition. This interpretive preference is especially strong when a finding of express condition would increase the risk of forfeiture by the obligee.[19]

*Oppenheimer, id.* at 690–91, 636 N.Y.S.2d 734, 660 N.E.2d 415 (internal citations and quotation marks omitted, footnote added).

This interpretive preference in general contract law against finding an express condition precedent in the words of a contract is reinforced, in the interpretation of a *surety* contract, by the cases holding that the bond of a compensated surety is to be construed liberally in the interest of the beneficiary, and ambiguities are to be resolved in the beneficiary's favor. *See McClare v. Massachusetts Bonding & Ins. Co.*, 266 N.Y. 371, 377, 195 N.E. 15 (1935); *Novak & Co. v. Travelers Indem. Co.*, 85 Misc.2d 957, 381 N.Y.S.2d 646 (N.Y.Sup. Ct.1976), *aff'd* 56 A.D.2d 418, 392 N.Y.S.2d 901 (2d Dep't 1977); *see also Bennett v. Brown*, 20 N.Y. 99 (1859) (rejecting overly-literal construction of words of condition in bond).

However, "[i]nterpretation as a means of reducing the risk of forfeiture cannot be employed if the 'occurrence of the event as a condition is expressed in unmistakable language.'" *Oppenheimer*, 86 N.Y.2d at 691, 636 N.Y.S.2d 734, 660 N.E.2d 415. In determining what language unmistakably demonstrates a condition, New York courts have held that if the contract actually uses the term "condition precedent," then the term will be construed as a condition rather than simply a promise. *See Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 112–13, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (1984) (finding condition precedent where requirements were contained in section entitled "Conditions Precedent to Purchaser's Obligation to Close," which provided that plaintiff's obligation was "subject to" fulfillment of the requirements); *McKegney v. Illinois Sur. Co.*, 170 A.D. 261, 262,

---

**19.** Forfeiture is defined as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially ... on the expectation of that exchange," *Oppenheimer*, 86 N.Y.2d at 692 n. 2, 636 N.Y.S.2d 734, 660 N.E.2d 415 (quoting Restatement (Second) of Contracts § 229, comment b), or has conferred a benefit upon the other party. *Oppenheimer, id.* at 692, 636 N.Y.S.2d 734, 660 N.E.2d 415. There is no doubt that if IFIC is denied compensation by F & G because these words are construed as creating a condition precedent to the indemnification obligation, IFIC will be subject to forfeiture, in that it will have lost its right to the agreed exchange after it has relied substantially on that exchange, by allowing Hirani to proceed with the project on the basis of the F & G Bond and F & G's promise to perform. Thus, this is a case in which the risk of forfeiture is applicable, leading to a preference for finding the words not to be a condition precedent.

155 N.Y.S. 1041 (1st Dep't 1915) (finding condition precedent where bond was "issued and accepted subject to the following conditions, which shall be conditions precedent to any right to recover hereunder"). In *Oppenheimer,* the court found that "the parties employed the unmistakable language of condition ('if,' 'unless and until')", *id.* at 691, 636 N.Y.S.2d 734, 660 N.E.2d 415, where "[t]he agreement provided that there would be no sublease between the parties 'unless and until' plaintiff delivered to defendant" the landlord's written consent, *id.* at 685, 636 N.Y.S.2d 734, 660 N.E.2d 415, that "if defendant had not received the prime landlord's written consent by the agreed date, both the agreement and the sublease were to be deemed 'null and void and of no further force and effect,'" *id.* at 688, 636 N.Y.S.2d 734, 660 N.E.2d 415, and "the parties 'agree not to execute and exchange the Sublease unless and until … the conditions set forth … above are timely satisfied.'" *Id.* Similarly, in *Lynbrook Glass & Architectural Metals Corp. v. Elite Assoc., Inc.,* 215 A.D.2d 453, 626 N.Y.S.2d 543 (2d Dep't 1995) the Appellate Division upheld summary judgment in favor of the defendant because the bond provided that "[n]o suit or action shall be commenced hereunder by any claimant[,] Unless claimant shall give written notice… " *Id.* at 454, 626 N.Y.S.2d 543.

The statement in the F & G Bond, that "the Surety's obligation under this Bond shall arise after," does not contain the kind of unmistakable language of condition described above. Therefore this language is to be interpreted as a promise rather than as a condition precedent. It not only contains none of the unmistakable language such as "condition precedent" or "unless and until," but—of critical importance—contains no statement whatsoever that the obligation does not arise in the absence of the actions listed. *See McKegney* (obligations were "subject to" fulfillment of requirements); *Oppenheimer* ("if" consent not received, obligations were "null and void"); *Lynbrook* ("no suit or action shall be commenced hereunder by any claim-

ant[,] Unless …"). Thus, while it is clear that the surety's obligations do arise once the default-and-termination actions have been taken, and that the surety must in those circumstances promptly implement one of the options specified in ¶ 4, these words do not compel the conclusion that the surety's obligations are "null and void" (or that "no suit or action shall be commenced") in the absence of those actions.

F & G argues in its Reply Memorandum that the F & G Bond "expressly provided that F & G's obligation on the bond arose *only* after" the steps in ¶ 3 had been taken, and that the F & G Bond "expressly says that F & G['s] obligation 'under the bond' *does not arise until* " the termination has occurred. Reply Memorandum at 5 (emphasis added). Notwithstanding F & G's argument, that is *not* what the F & G Bond says. If the words in ¶ 3 did say that F & G's obligation shall arise "only" after the steps are taken, or that it "shall not arise until" they are taken—or simply that the taking of these steps is a condition precedent to F & G's obligation—then the *absence* of obligation unless these actions were taken would have been clear, and the language of condition precedent would have been satisfied. Moreover, as F & G demonstrates in its brief, such language would have been easy to write, but that language was not included in the F & G Bond. Thus, based on the wording of ¶ 3, I conclude that the actions listed in the subparagraphs cannot be construed as express conditions precedent to any and all of F & G's obligations under the F & G Bond, regardless of what those obligations might be.

The construction of ¶¶ 1 & 2 of the F & G Bond support this conclusion. In ¶ 1, F & G binds itself (jointly with Hirani) "for the performance of the Construction Contract"; and in ¶ 2, the defeasance clause, the F & G Bond asserts that "[i]f the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond

..." The Contractor, however, did not perform its contract; rather, Hirani breached its obligation to complete the project by February 21, 1995. Thus, since the condition for release of F & G's obligation identified in the defeasance clause was not met, the obligation undertaken by F & G in ¶ 1, for performance of the contract, was not released. Therefore F & G—in the absence of unmistakable language expressly conditioning its performance obligation upon the performance of additional acts by IFIC—remains bound for the performance of the Construction Contract, including the obligation therein to indemnify IFIC for delay claims brought against it by the County for Hirani's delay in performance.

This conclusion is consistent with decisions applying New York law on this issue. In both *Aetna Casualty and Sur. Co. v. Manshul Constr. Corp.*, 95 Civ. 3994(LMM), 97 Civ. 5266(LMM), 1999 WL 717257 (S.D.N.Y. Sept. 15, 1999), and *Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13, 548 N.Y.S.2d 702 (2d Dep't 1989), the courts concluded that a notice of default was not a condition precedent to bringing a legal action against a surety, even where the bonds at issue, like the one in this case, provided a list of affirmative acts from which a surety was to choose in the event of a default by the contractor and a declaration of default by the obligee.

In both cases, the bond began with paragraphs in which the surety (jointly with the principal) bound itself for performance of the subcontract incorporated therein by reference, and added that "the Condition of this Obligation is such that, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect." *See* Affidavit of Thomas J. Demski, dated October 22, 1999 ("Demski Aff."), Ex. I (copy of bond in *Aetna* case); *Aetna* case file, Aetna's Memorandum of Law in Opposition to Post Road and Titan's Motion to Dismiss or for Summary Judgment, Doc. 159, Ex. A (copy of bond in *Menorah* case). In each case,

the next paragraph began, "Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder", and was followed by a list of alternative acts, such as having the surety remedy the default, or having obligee or surety arrange for the performance of the principal's obligation. In each case the surety argued that it could not be sued for indemnification based on its principal's failure to perform the contract, because the obligee had failed to give a notice of default by the surety's principal; and in each case the court held that the language was insufficient to create a "provision which expressly requires a notice of default as a condition precedent to any legal action on the bond." *Aetna*, 1999 WL 717257 at *2 (quoting *Menorah*, 153 A.D.2d at 21, 548 N.Y.S.2d 702). The *Aetna* court further held that "[t]he options given [the surety] in its bond in the event [its principal] is declared to be in default do not constitute such a provision." While the precise language of those bonds is not identical to the language in this case, the language, structure, and concepts of the bonds are sufficiently similar to support this Court's conclusion that a formal declaration of default and termination are not express conditions precedent to a legal action for indemnity on the F & G Bond.

This conclusion is logical in these circumstances. *Hirani's* obligation to indemnify IFIC for any delay damage claims brought against IFIC by the County—the obligation that F & G is being asked to perform—was not itself based on any requirement of declaration of default or termination. As discussed *supra*, damages for delay in a contractor's performance can be assessed whenever the delay causes damage to the owner, not only when the contractor's performance has been so unsatisfactory that a full declaration of default and termination is necessary or justified. *See* Stein, *Construction Law*, ¶ 11.02[3][e][i] ("inexcusable delay [subject to delay damages from contractor to own-

er] may arise in conjunction with the contractor's incomplete or defective performance, or a contractor may complete the performance of his [or her] contract without defect except for the failure to complete the work within the specified time period"); *see also* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.15 (2d ed.1998) (not every breach justifies a declaration of default and termination of the contract, but the injured party, including a construction project owner, may nevertheless recover from the breaching party in the case of a partial breach). The obligee is not required to formally default and terminate the contractor in order to obtain the surety's performance of a contractual obligation, the performance of which would have been required by the contractor even in the absence of default and termination. Moreover, the wording of the Surety's obligation in the F & G Bond lends support to this distinction: while the obligation in ¶ 6.2, by comparison, requires the Surety to pay for additional costs "resulting from the Contractor's Default," the obligation in ¶ 6.3 requires it to pay "actual damages *caused by delayed performance* or nonperformance of the Contractor", F & G Bond at ¶¶ 6.2 & 6.3 (emphasis added); there is no mention or requirement of formal Default.

Finally, there is no risk that a surety, asked to indemnify the obligee after a judgment against that obligee, may be subjected to any potential legal liability for fulfilling the contractor's contractual indemnification obligation in the absence of a default, since that obligation (at least in this Completion Contract) was not subject to the default requirement in the first place. This contrasts sharply with the situation that may face a surety that is asked to take the affirmative steps in ¶ 4 in the absence of such a declaration. A surety might, for example, arguably be subject to claims of tortious interference with contract if the surety took over the contract in the absence of a formal declaration of default and termination by the owner; or the surety might have trouble later obtaining indemnification from the principal if the surety paid the owner the excess cost of construction in the absence of a default, and the principal argued that the surety acted as a "volunteer" by making the payment without a declaration. No such risk applies to F & G's indemnification of a delay-damage judgment against IFIC, for which Hirani was obligated by the contract even in the absence of a default.

Consequently, based on both the language and structure of F & G Bond, and the logic of the claims before me, I conclude that a formal declaration of default and termination of Hirani was not an express condition precedent to F & G's obligation under the F & G Bond to indemnify IFIC for delay damages caused by Hirani's delayed performance. For the same reasons, I conclude that F & G's obligation to indemnify IFIC was not dependent upon a declaration of default and termination, even to the extent of being a constructive or implied condition precedent.[20]

However, even if the ¶ 3 actions were to be construed as *constructive* conditions or promises for the surety's obligation to indemnify, F & G would still be liable. In the case of constructive conditions or promises, only substantial performance by the obligee is required. *Oppenheimer*, 86 N.Y.2d at 690, 636 N.Y.S.2d 734, 660 N.E.2d 415. In fact, in New York cases dealing with the contracts of paid sureties, the courts consis-

---

**20.** I need not address here the issue of whether the law would imply an obligation on IFIC's part to notify F & G of developing problems and delay in Hirani's performance, *see Town of Clarkstown v. North River Ins. Co.*, 803 F.Supp. 827, 829–30 (S.D.N.Y.1992) (the law implies an obligation of notice of an occurrence within a reasonable time to put the insurer in the best possible position to reduce the cost of the claim), since it is not seriously disputed—or at the outside, there remains a triable issue of fact—that IFIC notified F & G of Hirani's delayed performance. This would preclude summary judgment on this point in F & G's favor, even if F & G were presumed to have effectively raised the argument.

tently reject the rule of strict construction and follow the approach of requiring only substantial compliance with the obligee's obligations, even where a close reading of the case suggests that the obligations may be express conditions. In *St. John's College v. Aetna Indem. Co.*, 201 N.Y. 335, 94 N.E. 994 (1911), for example, the Court of Appeals acknowledged the rule that material alteration of a contract for the performance of which a surety is bound, when made without the surety's consent, releases the surety from its obligation. However, it noted that "the rule of strict construction is liable at times to work a practical injustice, and it ought not to be extended beyond the reason for the rule" in the case of a paid surety. *Id.* at 342, 94 N.E. 994. Therefore, the court analyzed the violation to determine whether it was within the reason of the rule releasing the surety, and whether it had affected the surety adversely. When it reached a negative conclusion on both questions, the court concluded as well that application of the rule in that case would be unjust and harsh, and the surety should not have been released. *See also Hunt v. Bankers & Shippers Ins. Co. of N.Y.*, 60 A.D.2d 781, 400 N.Y.S.2d 645 (4th Dep't 1977) ("Hunt III")("Admittedly, the surety's liability is conditioned upon plaintiffs having performed their obligations under the construction contracts. As a compensated surety, however, that liability, in accordance with the ordinary canons of contract construction, is predicated upon substantial performance by the plaintiffs rather than that of strict construction of the contract") (citing, *inter alia, Newark v. James F. Leary Constr. Co.*, 118 Misc. 622, 194 N.Y.S. 212 (N.Y.Sup.Ct.1922)); *Bennett v. Brown*, 20 N.Y. 99 (1859) (rejecting overly literal construction of words of condition); *McKegney*, 170 A.D. 261, 155 N.Y.S. 1041 (demanding only substantial compliance by obligee with notice requirements). In *McKegney*, the court pointed out that the critical element of the analysis is that the surety had "obtained the opportunity to

protect itself for which it had provided in the undertaking." *Id.* at 264, 155 N.Y.S. 1041.

There is no doubt, based on the record before me on this motion, that IFIC gave F & G substantial opportunity to protect itself as it became ever clearer that Hirani was not performing satisfactorily, but, according to the most logical inferences on the record before me, F & G chose not to act. IFIC submits evidence of notices to F & G, sent repeatedly and over an extended period of time, detailing IFIC's concerns and the County's complaints about Hirani's inadequate performance, notifying F & G that IFIC was considering declaring Hirani in default and would hold F & G responsible for any damages the County might claim against IFIC, and requesting that F & G attend meetings, become involved, and help resolve the problems with Hirani. IFIC sent such communications as early as February 7, 1995, before Hirani was scheduled to complete its work by the original deadline of February 21, 1995. Yet, at least on this record, it appears to be virtually undisputed that F & G did not attend any meetings or take any affirmative action until at least 1996, after substantial completion of the construction project, despite its explicit obligation in ¶ 2 of the F & G Bond to "participate in conferences" arranged by IFIC to discuss performance of the contract pursuant to ¶ 3. Had F & G chosen to attend those meetings, it arguably could have assisted IFIC and Hirani in the resolution of problems, and might well have negotiated with all parties to provide financial or other assistance to its principal in a manner that would speed the project, improve performance, or avoid delay.

Given IFIC's evidence that it took repeated steps under ¶ 3 to draw F & G into the construction process and to get F & G to participate even by attending meetings—and given that there is at least a triable issue that F & G apparently refused to participate even by attending meetings—I cannot conclude that IFIC

failed as a matter of law to substantially perform, simply because it continued to work with Hirani (in absence of a declaration of default by the County), rather than unilaterally declaring a default-and-termination. Similarly, since F & G was kept fully informed of what was happening, and was given substantial opportunity to protect itself and ameliorate the growing damages, it cannot be said that IFIC's failure to formally default and terminate Hirani prejudiced F & G by preventing it from taking appropriate steps to mitigate its loss. There are numerous steps a surety can take to mitigate its losses before default and termination are declared, beginning with talking to the parties about what those steps might be. F & G took none of them, and cannot now say that it was IFIC's behavior, rather than F & G's, that contributed to its losses. *See, e.g., Winston Corp. v. Continental Casualty, Co.,* 508 F.2d 1298 (6th Cir.1975), *cert. denied,* 423 U.S. 914, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975) (where surety was kept aware of delays and problems but declined to attend any meetings, strict construction does not apply and owner's failure to strictly abide by requirements of bond in taking over project did not release surety from its obligations). "A surety cannot 'rest supinely, close his eyes, and fail to seek important information,' and then seek to avoid liability under the guaranty by claiming he was not supplied with such information." *Mohasco Indus., Inc. v. Giffen Indus., Inc.,* 335 F.Supp. 493, 497 (S.D.N.Y.1971) (citations omitted). As in *St. John's,* it would be both "harsh and unjust" and would work a "practical injustice" to relieve F & G of its liability under the facts of this case. *Id.* at 342, 94 N.E. 994.

In a situation such as this, even if the ¶ 3 requirements retained some applicability to an indemnification obligation, they could at best be construed as constructive conditions of exchange. Under that concept, a party's duty to perform, if the intent of the transaction so requires, may be construed as being conditioned upon another party's performance of an obligation due at an earlier time. *See generally* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.11 (2d ed.1998); *see also Industrial Mercantile Factors Co., v. Daisy Sportswear, Inc.,* 56 Misc.2d 104, 106, 288 N.Y.S.2d 209 (1967) ("in bilateral contracts for an agreed exchange of performances, even though the promises are in form absolute, the law regards them as constructively conditioned in order to avoid an unjust result"). Where IFIC has made substantial efforts to draw F & G into the sequence of steps outlined in ¶ 3, but F & G has refused to fulfill even the most minimal of its requirements, outlined in ¶ 2 of the F & G Bond, to "participate in conferences as provided in Subparagraph 3.1," justice requires that IFIC's completion of the steps outlined in ¶¶ 3.2 and 3.3 "be construed as being conditioned upon [F & G's] performance of the obligation" in ¶¶ 2 and 3.1, due at an earlier time, to participate in the conferences held to discuss ways to avoid the need for default and termination.

For these reasons, F & G's motion to be relieved of liability under the F & G Bond, due to IFIC's failure to fulfill certain conditions precedent to F & G's liability, is denied.

## II. Limitation of F & G's Liabilities Under the F & G Bond.

F & G has asked the Court to declare that its liability to IFIC under the F & G Bond is limited to the penal amount of that bond. IFIC has not disputed this point, and I find no basis for disagreeing with F & G's position. The damages at issue here are actual damages caused by the delayed performance of Hirani, and in regard to such damages the F & G Bond clearly states, *"To the limit of the amount of this Bond,* ... the Surety is obligated for ... actual damages caused by delayed performance or non-performance of the Contractor." F & G Bond at ¶ 6 (emphasis added). None of the exceptions applicable in

the case of a contract takeover by the surety apply here. In the absence of those exceptions, New York law is clear that

> [w]hen any undertaking executed within or without the state specifies that it is to be void upon payment of an amount or performance of an act, .... *[i]n the event of payment,* the amount recoverable from a surety shall not exceed the amount specified in the undertaking except that interest in addition to this amount shall be awarded from the time of default by the surety.

New York General Obligations Law § 7–301 (emphasis added). Moreover, as discussed in detail above, New York courts strictly interpret the limits of liability of a surety under its bond. For these reasons, F & G's motion to limit its liability to the penal sum of the F & G Bond is granted.

F & G has also asked that the earliest date of liability attributable to F & G should be specified as February 21, 1995, the date on which Hirani's performance under the Completion Contract initially fell due. IFIC does not appear to contest this point. At this time, such a conclusion seems to be the most logical one, based on the record before me. However, I have earlier concluded that the parties may, if they wish, present further evidence at trial on the issue of how to apportion damages between NANCO and IFIC/Hirani, if they dispute my conclusion that the February 21, 1995, date is the most reasonable one for establishing the division between NANCO-caused damages and those attributable to F & G and Hirani. Thus, it would be inappropriate to grant summary judgment on this part of F & G's claim at this time, although in the absence of convincing evidence to the contrary at trial, I will conclude that this date forms the beginning of any liability on the part of Hirani and F & G.

### CONCLUSION

For the reasons set forth herein, IFIC's motion (and F & G's corresponding motion) to dismiss as time-barred the Coun-

ty's counterclaim against IFIC for delay damages is granted in part and denied in part. Specifically, the motion to dismiss is granted as to the portion of the County's claim that is based upon delay damages caused by NANCO's delay in performance, except to the extent that that claim constitutes a setoff against IFIC's claim against the County. However, the motion to dismiss is denied as to the portion of the County's claim that is based upon delay damages caused by IFIC's own delayed performance of the Completion Contract. In addition, IFIC's motion to award to it, on summary judgment, the funds constituting the remaining balance of the initial contract price, is denied. IFIC's motion (and F & G's corresponding motion) to limit IFIC's liability to the County to the penal sum of the performance Bond, executed by IFIC in favor of the County as obligee, is also denied.

F & G's motion to dismiss any "claims over" brought by IFIC against F & G, on the basis of IFIC's failure to comply with certain conditions precedent in the F & G Bond, is denied. However, F & G's motion to limit its liability to IFIC to the penal sum of the F & G Bond is granted. Finally, IFIC's motion requesting that the earliest date of liability attributable to it should be specified as February 21, 1995, is denied at this time, with leave to renew at the conclusion of the trial, pending the presentation of any additional evidence that might bear upon the question of the most appropriate date for division of liability between NANCO and F & G/Hirani.

**SO ORDERED.**